UNITED STATES of America, Plaintiff,

v.

NL INDUSTRIES, INC.,
et al., Defendants,

and

City of Granite City, Illinois, Lafayette
H. Hochuli, and Daniel M. McDowell,
Intervenor–Defendants.

No. 91–CV–578–JLF.

United States District Court,
S.D. Illinois.

Aug. 22, 1996.

U.S. Department of Justice, Washington, D.C., Mark A. Nitczynski, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., for Plaintiff.

James Schink, Reed S. Oslan, Kirkland & Ellis, Chicago, IL, Steven A. Tasher, Bonni F. Kaufman, Willkie, Farr & Gallagher, Washington, D.C., Janet D. Smith, NL Industries, Inc., New York City, John W. Roberts, Sr., Zavnik, Horton, Guibord & McGovern, Chicago, IL, Allan M. Goodloe, Jr., Thompson Coburn, Belleville, IL, George M. von Stamwitz, Douglas R. Sprong, Armstrong, Teasdale, Schlafly & Davis, St. Louis, MO, William G. Dickett, Sheila B. Kennedy, Sidley & Austin, Chicago, IL, Dennis P. Reis, Amy M. Hindman, Quarles & Brady, Milwaukee, WI, Bruce D. Ryder, Thompson Coburn, Belleville, IL, Kenneth J. Mallin, Joseph G. Nassif, Thompson Coburn, St. Louis, MO, Louis F. Bonacorsi, Bryan Cave, St. Louis, MO, David G. Butterworth, David MacGregor, Morgan, Lewis & Backus, Philadelphia, PA, J. Martin Hadican, Clayton, MO, Crystal M. Kennedy, Thompson Coburn, St. Louis, MO, Richard J. Pautler, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, MO, Michael J. Merlo, Merlo, Kanofsky, Chicago, IL, Karen L. Douglas, Prospect Heights, IL, Brent Clark, Jeryl Dezelick, Thomas Dent, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, Edward C. Fitzhenry, Jr., Lueders, Robertson & Konzen, Granite City, IL, Susan E. Bacon, Granite City, IL, Mark C. Goldenberg, Bono, Goldenberg, Hopkins & Bilbrey, Granite City, IL, for Defendants.

William E. Coonan, Assistant U.S. Attorney, Fairview Heights, IL, John H. Grady, Kevin P. Holewinski, Leonard M. Gelman, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C., Steven M. Siegel, Sean Mulroney, U.S. Environmental Protection Agency, Chicago, IL, Helen Keplinger, U.S. Environmental Protection Agency, Washington, D.C., Barry M. Hartman, Acting Asst. Attorney General, Environment & Natural Resources Division,

### MEMORANDUM AND ORDER

FOREMAN, District Judge:

Before the Court are motions for a temporary restraining order and preliminary injunction filed by defendants NL Industries, Inc., Johnson Controls, Inc., AT & T Corporation, Allied–Signal, Inc., Gould Electronics, Inc., and General Battery Company (Doc. No. 218), in which defendant Exide Corporation joins (see Doc. No. 227), and the City of Granite City ("City") (Doc. No. 220).

## I. Introduction

The NL Industries/Taracorp Superfund Site includes roughly 16 acres in and around Granite City, Illinois, where a battery recycling facility and secondary lead smelter was operated from 1903 to 1983. Also included in the site are approximately 55 square blocks of residential property surrounding the smelter.

The United States Environmental Protection Agency ("EPA") is in the process of removing soil from residential yards in Granite City, Illinois, that have lead levels greater than 500 parts per million ("ppm"). The lead in the residential soil resulted from the emission of lead from smelting operations. The City and the defendants argue that the EPA's selection of the 500 ppm clean-up level was arbitrary and capricious and they believe that limiting the clean-up to residential properties with 1000 ppm or greater will adequately protect human health.[1] The City and the defendants seek to have the Court enjoin the residential clean-up until the Court has addressed the propriety of the EPA's selection of the 500 ppm clean-up threshold.

## II. Procedural Background

The United States filed its complaint on July 31, 1991. The defendants and others were named as Potentially Responsible Parties ("PRPs") as either owner-operators of the smelter or as transporters of hazardous material to the site. *See* sections 106 and 107 of CERCLA,[2] 42 U.S.C. §§ 9606 & 9607. As such, the PRPs are potentially liable for costs associated with cleaning up the site under 42 U.S.C. § 9607. The plaintiff seeks: (1) to recover past response costs associated with the clean-up of hazardous materials at the site; (2) a declaration that the PRPs will be liable for future response costs; (3) injunctive relief to compel the PRPs to under-

take response actions at the site; and (4) civil penalties and punitive damages. Complaint, Doc. No. 1. The City intervened in an attempt to stop or limit the scope of the EPA's proposed clean-up. *See* Doc. Nos. 50 & 76.

## III. Jurisdiction

The City and the defendants cite CERCLA §§ 113(h)(1) & (4), 42 U.S.C. 9613(h)(1) & (4), as the bases on which the Court has jurisdiction to enjoin the EPA's remedial action.[3] Section 113(h) provides in pertinent part:

**(h) Timing of review**

No Federal Court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following:

(1) An action under 9607 of this title to recover response costs or damages or for contribution.

. . . .

(4) An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

### A. Jurisdiction Under § 113(h)(1)

█ The City and the PRPs argue that the plain language of § 113(h)(1) provides

---

1. Approximately 350 residential properties have soil lead levels greater than 1000 ppm; another 1000 have levels greater than 500 ppm.

2. CERCLA is the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601–9675.

3. A "remedial action" is the implementation of a permanent remedy. 42 U.S.C. § 9601(24). A "removal" is a short-term action taken in response to a release or threat of release of hazardous substances into the environment. 42 U.S.C. § 9601(23). A "response" includes both "remedial actions" and "removal" actions. At issue in this case is the EPA's remedial action at the site.

that the Court has jurisdiction to award injunctive relief upon the filing of a cost recovery action under § 107, 42 U.S.C. § 9607.[4] The EPA does not dispute the City's assertion that the Court has jurisdiction under § 113(h)(1) to review the selected remedy once a § 107 action is filed. However, the EPA takes issue with the City's contention that the Court has jurisdiction under § 113(h)(1) to enjoin an ongoing remedial action. The EPA contends that § 113(h)(1) gives the Court jurisdiction in a cost recovery action under CERCLA only to consider the PRP's defenses to liability and to challenge costs assessed against them.

In support of their assertion that § 113(h)(1) gives the Court jurisdiction to enjoin the clean-up, the City and the PRPs rely on *United States v. Princeton Gamma–Tech, Inc.*, 31 F.3d 138 (3d Cir.1994). The defendant in *Princeton Gamma–Tech* sought to enjoin the EPA from drilling through the contaminated shallow layer of an aquifer into deeper and apparently uncontaminated layers on the grounds that the drilling would contaminate the deeper layers. The court concluded that once the EPA brought the cost-recovery suit under CERCLA, the jurisdictional bar to review of challenges to EPA's remedial action was lifted.

With regard to the remedies available, the court looked to § 113(j)(3), which provides:

If the court finds that the selection of the response action was arbitrary and capricious or otherwise not in accordance with law, the court shall award (A) only the response costs or damages that are not inconsistent with the national contingency plan, and (B) such other relief as is consistent with the National Contingency Plan.[5]

The court observed that § 113(j)(3) "makes it clear that the available remedies are not limited to a mere reduction of the amount recoverable for expenditures, but may also include any relief consistent with the National Contingency Plan." *Princeton Gamma–Tech*, 31 F.3d at 144. The court concluded that granting injunctive relief is consistent with the National Contingency Plan where the proposed remedy poses a bona fide threat of irreparable harm to public health or the environment. *Id.* at 148.

While *Princeton Gamma–Tech* clearly supports the position of the City and the PRP's, the Seventh Circuit has taken a more restrictive view of the relief available under § 113(h). In *North Shore Gas Co. v. E.P.A.*, 930 F.2d 1239 (7th Cir.1991), Outboard Marine Corporation was ordered to clean up contamination at a Superfund site in Waukegan Harbor on Lake Michigan. North Shore was identified as a PRP in an adjoining superfund site that overlapped the Outboard Marine site. The EPA ordered Outboard Marine to build a new slip in the overlapping area between the two sites because the old slip was to be used to store hazardous waste. North Shore objected on the grounds that their costs would be higher and filed suit under NEPA and RCRA to enjoin the construction of the new slip. *Id.* at 1241.

The court first determined that North Shore did not have standing under NEPA or RCRA to challenge the construction of the new slip. *Id.* at 1243–44. The court then went on to analyze the jurisdictional bar of § 113(h). The court observed that "the purpose of section 113(h) is to prevent litigation from delaying remediation." *Id.* at 1244. The court posed a hypothetical in which, had the EPA listened to reason, the cost to build the new slip would be $1 million less with no added cost to Outboard Marine or the environment. *Id.* at 1245. North Shore's most promising course of action would be to sue the government for reimbursement under 42

---

**4.** The City directs the Court to the jurisdictional argument it presented in its Memorandum submitted in 1994, Doc. No. 131, when the City and the defendants previously sought to enjoin the clean-up. Doc. No. 235 at 6. The matter was resolved—albeit temporarily—before the Court addressed the parties' arguments.

**5.** CERCLA § 105, 42 U.S.C. § 9605, requires the President to "revise and republish the national contingency plan for the removal of oil and hazardous substances, originally prepared and published pursuant to section 1321 of Title 33, to reflect and effectuate the responsibilities and powers created by this chapter...." The revision of the plan is required to include a "national hazardous substance response plan which shall establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants, ...: *Id.*

U.S.C. § 9606(b)(2)(D), which is exempted from the jurisdictional bar by § 113(h)(1), 42 U.S.C. § 9613(h)(1). *Id.* However, the remedial order was addressed to Outboard Marine, not North Shore, and "the statute as worded envisages a suit by the person to whom the remedial order was addressed...." *Id.* The court observed that

> the purpose of [§ 113(h)] was not to defeat an aggrieved person's presumptive right of judicial review of agency action, *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670–73, 106 S.Ct. 2133, 2135–37, 90 L.Ed.2d 623 (1986), but merely to postpone the exercise of the right to the completion of the remedial action. *Schalk v. Reilly,* 900 F.2d 1091, 1095 (7th Cir. 1990); *Alabama v. EPA,* 871 F.2d 1548, 1557–58 (11th Cir.1989). However, the method of section 113(h) is not to toll judicial remedies, and leave it at that; it is to specify the remedies that survive. Once the remedial action has been completed, a suit either to enjoin the action or to compel it is moot, and *the statute does not authorize either form of suit.*

*Id.* (emphasis added).

With regard to the remedies available under § 113(h), the court noted that

> a party in North Shore's situation still has an action for reimbursement, § 113(h)(3), or contribution, § 113(h)(1); the federal or a state government its suit to recover response costs, *id.;* the citizen complainer his action to enforce the order if it is not obeyed, § 113(h)(4). If the provision on suits for reimbursement is not interpreted generously, a firm in North Shore's position may find itself without any judicial remedy against arbitrary and capricious agency action, and that was not Congress's intent.

*Id.*

The PRPs in the present action do not face the problem confronted North Shore in the court's hypothetical; the PRPs in this case were named in the remedial order. Thus, the PRPs have relief available under the statute. The only harm the PRPs face is monetary and, if they can show that the EPA's remedy selection was arbitrary and capricious or that they were not responsible for the pollution, they can avoid some or all liability for the clean-up.

The City is in a different position, however. Should the Court find that it does not have jurisdiction to enjoin the clean-up, the City will be left with no meaningful relief for all practical purposes. The only relief sought by the City, apart from attorneys fees, is an injunction against the clean-up. If there is no judicial review until after the remedial action is completed, the City's action is moot.

The *North Shore* court, after noting the "troublesome" breadth of section 113(h), proposed a hypothetical situation that is instructive with regard to the City's position:

> Suppose the EPA took the position that 'Waukegan Harbor' includes Racine Harbor. Would there be no possibility for judicial review at the behest of users of Racine Harbor adversely affected by the application of the remedy to them? *It looks that way,* though no doubt the courts would strain to avoid so unappetizing a result. Cf. *Adamo Wrecking Co. v. United States,* 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978). Our hypothetical users would have no suit for reimbursement unless they were ordered to clean the harbor up, and let us suppose they were not. In such a case section 113(h) would be doing a good deal more than affecting the "timing" of judicial review; it would be extinguishing judicial review.

*Id.* at 1245 (emphasis added).

At oral argument, the PRPs argued that the City is in the same position as the users of Racine Harbor in the *North Shore Gas* hypothetical. The point is well taken. However, the *North Shore* court indicated that the users of Racine Harbor would have no opportunity for judicial review. ("It looks that way...."). Moreover, the Court does not have to "strain" to avoid the result posed in the hypothetical because the EPA's selection of the 500 ppm versus a 1000 ppm soil lead threshold in this case does not rise to the level of patent absurdity as would including Racine Harbor in the definition of Waukegan Harbor. This is not to say that the selection of the 500 ppm threshold may not be found arbitrary and capricious after a

thorough examination of the administrative record. The point is that implementation of the clean-up using the 500 ppm threshold, as opposed to a 1000 ppm threshold, does not present a situation in which the Court finds a need to swim against the tide of persuasive authority on this issue.

The Seventh Circuit also addressed the scope of § 113(h) in *Employers Insurance of Wausau v. Browner,* 52 F.3d 656 (7th Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 699, 133 L.Ed.2d 656 (1996), where the defendant PRP challenged the EPA's position that the defendant was barred from seeking reimbursement for clean-up costs unless it fully complied with a § 106 clean-up order. The defendant was responsible for only a small portion of the pollution at the site. In the district court, the defendant argued that the EPA lacked statutory authority to condition reimbursement on the cleaning up of pollution for which the defendant was not responsible. Speaking for the court, Chief Judge Posner stated that "[i]nsofar as the company sought merely to vacate or narrow the order as inconsistent with the authorizing statute, it ran afoul of section 9613(h), the provision that provides the exclusive methods of challenging clean-up orders—*and they do not include a suit for injunctive or declaratory relief by the person ordered to perform a clean-up.*" *Id.* at 665 (emphasis added).

■ While the Seventh Circuit statements cited above are *dicta,*[6] they are instructive in that they reveal a preference for a narrow interpretation of the statutory language rather than the broad interpretation reflected in *Princeton Gamma–Tech.* The *Employers Insurance* court observed that the relief available under § 9613(h) does not include a suit for injunctive or declaratory relief *by the person ordered to perform a clean-up.* On the other hand, the statute does not allow for a suit for injunctive or declaratory relief by anyone else, including a person not named in the clean-up order. Thus, there is no basis on which to conclude that the City may seek remedies that are not available to the PRPs.[7]

The legislative history of § 113(h)(1)—while not specifically addressing the jurisdiction of federal courts to enjoin ongoing remedial actions—tends to support the EPA's position. The House conference report that reconciled the conflicting House and Senate versions of the statute is not helpful with regard to § 113(h)(1) other than to say that the conference committee adopted the version contained in both the House and Senate amendments. H.R.Rep. No.99–962, 99th Cong., 2d Sess 223, *reprinted in* 1986 U.S.C.C.A.N. 3276, 3316.

The report of the House Energy and Commerce Committee expresses an intent to permit review of the remedial action once a cost-recovery action under § 107 is filed, but it does not anticipate an action seeking to enjoin the remedial action. The report states that "[r]esponse actions or consent orders under section 104 and orders under section 106 may be subject to judicial review at the

---

**6.** In *Employers Insurance,* the defendant waived its argument that the clean-up order was overbroad. *Employers Ins.,* 52 F.3d at 666. In *North Shore,* the court was speaking hypothetically.

**7.** The City intervened pursuant to CERCLA § 113(i), 42 U.S.C. § 9613(i), which provides:

In any action commenced under this chapter ... in a court of the United States, any person may intervene as a matter of right when such person claims an interest relating to the subject of the action and is so situated that the disposition of the action may, as a practical matter, impair or impede the person's ability to protect that interest, unless the President or the State shows that the person's interest is adequately represented by existing parties.

As a plaintiff, an intervenor may assert the same procedural and substantive claims that the United States may pursue under CERCLA.

*U.S.E.P.A. v. Environmental Waste Control, Inc.,* 917 F.2d 327, 332 n. 2 (7th Cir.1990), *cert. denied,* 499 U.S. 975, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). The parties do not cite any authority regarding the remedies available to defendant-intervenors under CERCLA and the Court has been unable to find any that is instructive. In most cases, parties intervene in CERCLA actions to compel the EPA to perform a non-discretionary duty, *see, e.g., State of New York v. Reilly,* 143 F.R.D. 487 (N.D.N.Y.1992), or to contest a consent decree under CERCLA. *See, e.g., United States v. Union Elec. Co.,* 64 F.3d 1152 (8th Cir.1995); *United States v. Alcan Aluminum, Inc.,* 25 F.3d 1174 (3d Cir.1994). The absence of any authority on this issue is of no moment because the plain language of § 113(i) does not provide an intervenor with any additional remedies beyond those available to the parties in the underlying action.

time the government seeks cost recovery...." H.R.Rep. No. 99–253(I), 99th Cong., 2d Sess 81, *reprinted in* 1986 U.S.C.C.A.N. 2835, 2863. However, the report also states that § 113(h) "is intended to codify the current position of the Administrator and the Department of Justice with respect to preenforcement review: there is no right of judicial review of the Administrator's selection and implementation of remedial actions until after the remedial action have been completed to their completion [sic]." *Id.* These two statements taken together apparently reflect a presumption that the government would not bring a cost recovery action until after the remedial action is completed, but the statement of intent indicates that the purpose of § 113(h) that the cleanup of hazardous waste should not be delayed by litigation. See *North Shore,* 930 F.2d at 1244 ("And the purpose of section 113(h) is to prevent litigation from delaying remediation."); *Schalk,* 900 F.2d at 1095 ("Congress intended by this statute to prevent unnecessary delay in implementing hazardous waste cleanups.").

The report of the House Public Works and Transportation Committee provides:

> The purpose of this provision [§ 113(h) ] is to ensure that there will be no delays associated with a legal challenge of the particular removal or remedial action selected under section 104 or secured through administrative order or judicial action under section 106. Without such a provision, responses to releases or threatened releases of hazardous substances could be unduly delayed, thereby exacerbating the threat of damage to human health or the environment. A person's rights to challenge the choice of removal or remedial action are preserved, however, and can be exercised when an action is taken against a responsible party to recover response costs or damages under section 107, ...

H.R.Rep. No. 99–253(V), 99th Cong., 2d Sess 25–26, *reprinted in* 1986 U.S.C.C.A.N. 3124, 3148–49. This passage also reflects an apparent expectation that the government would not seek reimbursement costs until after the completion of a remedial action.

But again, in order to fulfill the expressed intent of the statute—to prevent litigation from delaying the clean-up—the statute must be interpreted so as to prohibit enjoining a remedial action while allowing a defendant in a cost-recovery action to assert defenses to liability.

The House Judiciary Committee reported the same version of §§ 113(1), (2) & (3) as reported by the House Energy and Commerce Committee with the comment that "in the absence of a government enforcement action, judicial review of the selection of a remedial action should generally be postponed until after the response action is taken." H.R.Rep. No. 99–253(III), 99th Cong., 2d Sess 22, *reprinted in* 1986 U.S.C.C.A.N. 3038, 3045. The Judiciary Committee report provides some support for the argument that a party may seek to enjoin a remedial action prior to its completion under § 113(h). *Id.* at 3047 (stating that a party seeking to stay a response action must show irreparable harm and likelihood of success on the merits). However, it is unclear whether these statements refer to § 113(h) in its entirety or to some proposed amendments that were not adopted. (§ 113(i)(6), (7) & (8) in the report). *Id.* at 3046–47. In any case, even if the proposed amendments had been adopted, the report states that staying a response action would occur "rarely, if at all[.]" *Id.* at 3047.

Based upon the persuasive authority cited above and the legislative history of § 113(h)(1), the Court concludes that § 113(h)(1) does not provide federal courts with jurisdiction to enjoin an ongoing remedial action. Rather, § 113(h)(1) gives federal courts jurisdiction to review the propriety of the EPA's selected remedy once a § 107 action is filed. Defendants may assert defenses to liability, but the statute does not explicitly permit the Court to enjoin an ongoing remedial action. If the Court finds that the EPA's remedy selection was arbitrary and capricious based upon the administrative record, § 113(j)(1), the Court can limit a PRP's liability to "only the response costs or damages that are not inconsistent with the national contingency plan[,]" § 113(j)(3)(A), and award "such other relief as is consistent

with the National Contingency Plan." § 113(j)(3)(B). Even if the Court concluded that injunctive relief is consistent with the NCP—which it does not—the plain language of the statute requires a finding that the remedy selection is arbitrary and capricious *before* any relief may be awarded under § 113(j)(3)(B).[8]

For the foregoing reasons, the Court concludes that it does not have jurisdiction under CERCLA § 113(h)(1), 42 U.S.C. § 9613(h)(1), to enjoin an ongoing remedial action.

### B. Jurisdiction Under § 113(h)(4)

■ In the alternative, the City and the PRPs argue that the Court has jurisdiction to award injunctive relief under CERCLA § 113(h)(4), 42 U.S.C. § 9613(h)(4)—the citizens suit exception to the bar on judicial review.[9] Again, the City and the PRPs primarily rely on *Princeton Gamma–Tech* to support their argument. In analyzing the citizens suit exception to the bar on judicial review, *Princeton Gamma–Tech* supported its conclusion that a federal court has jurisdiction to enjoin an ongoing remedial action under § 113(h)(4) with a somewhat strained analysis of the statute's legislative history by quoting statements from individual legislators during debate on CERCLA. *Id.* at 145–46. The concurring opinion in *Princeton Gamma–Tech* agreed with the majority's holding that jurisdiction was proper under § 113(h)(1), but took exception to its analysis of § 113(h)(4). *Id.* at 150–53 (Nygaard, J. concurring). The concurrence pointed out that every other United States Court of Appeals that had addressed the issue held that

federal courts do not have jurisdiction to review the EPA's remedy selection under § 113(h)(4) until the remedial action is completed. *Id.* at 151. The primary basis of those holdings is the textual analysis of the statute, which refers in the past tense to actions *taken* or *secured* and the statute's legislative history. *Id.* (citing *Arkansas Peace Ctr. v. Arkansas Dep't of Pollution Control and Ecology*, 999 F.2d 1212, 1216–17 (8th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *North Shore Gas Co. v. U.S.E.P.A.*, 930 F.2d 1239, 1244–45 (7th Cir.1991); *Schalk v. Reilly*, 900 F.2d 1091, 1095 (7th Cir.1990), *cert. denied*, 498 U.S. 981, 111 S.Ct. 509, 112 L.Ed.2d 521 (1990); *State of Alabama v. E.P.A.*, 871 F.2d 1548, 1557–58 (11th Cir.), *cert. denied*, 493 U.S. 991, 110 S.Ct. 538, 107 L.Ed.2d 535 (1989)). With regard to the majority's legislative history analysis, the concurrence observed that "it is a well-established principle of statutory interpretation that contradictory floor statements by individual members, even the sponsors of the bill, are of extremely limited authority and cannot override the committee and conference reports." *Id.* at 152 (citing *Brock v. Pierce County*, 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986); *Garcia v. United States*, 469 U.S. 70, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984); *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)).

The legislative history of § 113(4)(4) was thoroughly addressed by the Seventh Circuit in *Schalk*, where the Court stated, "[t]he legislative history supports the conclusion that federal courts are deprived of subject matter jurisdiction where remedial action has

---

**8.** The Court will address the propriety of the EPA's remedy once the Court resolves the issues raised by the instant motions as well as the pending motions for leave to file counterclaims and the parties' submissions regarding the appropriate scope of review.

**9.** CERCLA § 310, 42 U.S.C. § 9659, which permits citizen suits provides in pertinent part:

Except as provided in subsections (d) and (e) of this section and in section 9613(h) of this title (relating to timing of judicial review), any person may commence a civil action on his own behalf—

(1) against any person (including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter ... or

(2) against the President or any other officer of the United States (including the Administrator of the Environmental Protection Agency and the Administrator of the ATSDR) where there is alleged a failure of the President or of such other officer to perform any act or duty under this chapter ... which is not discretionary with the President or such other officer.

not been completed." *Schalk,* 900 F.2d at 1096. The court summarized the legislative history of § 113(h)(4) as follows:

> The final conference committee report that reconciled the conflicting House and Senate versions explained that only "completed" remedial actions could be challenged. H.R.Rep. No. 962, 99th Cong., 2d Sess. 224 (1986), U.S.Code Cong. & Admin.News 1986, p. [3317]. The House Committee on Energy and Commerce stated that "there is no right to judicial review of the Administrator's selection and implementation of response actions until after the response action have been completed to their completion [sic]" H.R.Rep. No. 253(I), 99th Cong., 2d Sess. 81 (1986), U.S.Code Cong. & Admin.News 1986, p. 2863. The House Judiciary Committee noted that "[t]his provision is not intended to allow review of the selection of a response action prior to completion of the action...." H.R.Rep. No. 253(III), 99th Cong., 2d Sess. 23 (1986), U.S.Code Cong. & Admin.News 1986, p. 3046. These committee reports, along with many other statements of congressional leaders, far outweigh the few contrary remarks of individual legislators cited by plaintiffs. The statute as written clearly states the intent of Congress.

*Id.* at 1096.

The *Princeton Gamma–Tech* court distinguished *Schalk* and two other circuit court decisions, *Arkansas Peace Center v. Arkansas Dept. of Pollution Control and Ecology,* 999 F.2d 1212 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994) and *Alabama v. EPA,* 871 F.2d 1548 (11th Cir.), *cert. denied,* 493 U.S. 991, 110 S.Ct. 538, 107 L.Ed.2d 535 (1989), on the grounds that those cases did not involve "bona fide assertions of irreparable environmental damage resulting from violations of CERCLA's policies." *Id.* at 144; *see also id.* at 148. However, this conclusion is not accurate. The plaintiffs' specific allegations of

harm in *Arkansas Peace Center* are not included in the Eighth Circuit's opinion. However, the district court had found the risk of the carcinogenic and non-carcinogenic effects of dioxin incineration sufficient to enjoin the incineration. *Arkansas Peace Ctr. v. Arkansas Dep't of Pollution Control and Ecology,* No. LR–C–92–684, 1993 WL 95654 at *4 (E.D.Ark. March 17, 1993). In *Schalk,* the plaintiffs filed a citizens suit under CERCLA § 310(a)(2) to challenge a consent decree that required the excavation and incineration of hazardous wastes. The allegations in *Schalk* were that incineration of PCBs would "exacerbate damage to the environment and risk poisoning many citizens." *Schalk,* 900 F.2d at 1094 n. 2. Neither the district courts nor the appellate courts reached the merits of the plaintiffs' allegations in either case—both circuit courts found the actions barred by 113(h)—but there is no doubt that the complaints sufficiently *asserted* claims of irreparable harm.[10]

In any case, the Seventh Circuit clearly stated that federal courts do not have jurisdiction under § 113(h)(4) to enjoin an ongoing remedial action. *Schalk,* 900 F.2d at 1096–97. The *Schalk* court stated that "[t]he obvious meaning of the statute [§ 113(h)(4) ] is that when a remedy has been selected, no challenge to the cleanup may occur *prior to the completion of the remedy.*" *Id.* at 1095 (emphasis added). In addition to the court's analysis of the statute's legislative history discussed above, the court adopted the Eleventh Circuit's reasoning in *Alabama* where that court held that the clear legislative intent to deprive federal courts of jurisdiction until the remedial action is completed is expressed by section 113(h)(4)'s reference in the past tense to remedial actions *taken* or *secured.* *Id.* (citing *Alabama,* 871 F.2d at 1557). Thus, the "blunt withdrawal of federal jurisdiction in § 113(h)[,]" *North Shore,* 930 F.2d at 1244, precludes the Court from

---

**10.** In *Alabama,* the plaintiffs sought to enjoin the shipment of 40,000 tons of PCB-laden soil from Texas to Alabama. Neither of the district court opinions, *Alabama v. U.S.E.P.A.,* 711 F.Supp. 574 (M.D.Ala.1988); *Alabama v. U.S.E.P.A.,* No. 88V–987–N, 1988 WL 156726 (M.D.Ala. October 21, 1988), nor the Eleventh Circuit opinion reveal

plaintiff's specific allegations of irreparable harm. However, the district court enjoined the shipment after finding that there was a substantial threat that the plaintiffs would suffer irreparable harm if the injunction was denied. *Alabama,* 1988 WL 156726 at *3.

considering the City's and the PRP's claims until after the remedial action is completed.

## IV. Irreparable Harm

Even if the Court followed the holding of *Princeton Gamma–Tech*—that injunctive relief may be issued when irreparable harm to public health or the environment is threatened, *Princeton Gamma–Tech*, 31 F.3d at 148—the City and the PRPs have not established that implementation of the EPA's remedy presents a bona fide threat of irreparable harm to the public health or the environment. The allegations of irreparable harm caused by the clean-up include: (1) an adverse impact on the City's economy; (2) disruption of traffic planning and construction; (3) the City's residents would be misled "into believing their homes have been improved when problems remain," primarily lead in household paint; and (4) removing soil with lead levels greater than 500 ppm, rather than 1000 ppm, will provide no appreciable benefit for the City's residents. Doc. No. 228.

In support of its claim that the City's economy will be adversely impacted by the clean-up, the City has submitted the affidavit of Geoffrey Hewings, a professor in the Departments of Geography and Urban and Regional Planning at the University of Illinois. Doc. No. 228, Ex. A. Professor Hewings's opinion is that "the remedy chosen by the EPA will adversely impact the residents and businesses in Granite City." *Id.* at 3, ¶ 9. Professor Hewings bases this conclusion on: (1) reduction in property values in the City, *id.*, ¶ 11; (2) increased traffic congestion, *id.*, ¶ 12; and (3) decreased City tax revenues. *Id.*, ¶ 13.

Professor Hewings's conclusion that property values in the City have decreased is not supported by any evidence that such a decrease has been caused by the *remedy* as opposed to the *pollution*. Moreover, it defies logic that a home that has been designated as having dangerously high soil lead levels—regardless of whether the lead levels are in fact dangerous—would be more valuable than one that has been remediated, all other things being equal.

With regard to the increased traffic congestion, Professor Hewings concludes that "the impact on businesses in Granite City will be devastating" and "[r]esidents and customers, who frequent businesses in the downtown area of Granite City, will face increased traffic, congestion, and delays relating to the remedy," which will result in "the potential [ ] for businesses in downtown Granite City to fail." *Id.* at 3–4. It is well established that "the right to continue a business ... is not measurable entirely in monetary terms." *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970); *accord Kinney v. International Union of Operating Eng'rs, Local 150, AFL–CIO*, 994 F.2d 1271, 1279 (7th Cir.1993); *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir.1984). However, Professor Hewings provides no factual basis to support his conclusion that conducting the remedial action in residential neighborhoods will adversely affect downtown businesses. But more importantly, his conclusion that "the potential exists" for downtown businesses to fail is too speculative to support a claim of irreparable harm. Because Professor Hewings's conclusion that the City will lose tax revenue is based upon his findings that property values will decrease and downtown businesses may be lost, which the Court has found unpersuasive, the Court concludes that the threat of decreased tax revenue is insufficient to support a claim of irreparable harm.

The City next argues that the clean-up threatens the construction of the "16th Street Corridor." The City supports this conclusion with the affidavit of William Baudendistel, a contract engineer for the City of Granite City. Doc. No. 228, Ex. B. Baudendistel states that 16th Street is a "vital, economic link for Granite City Steel," the construction of which will cost approximately $1.5 million. *Id.* Baudendistel further states that "the City surmises that because the project site is considered to be a portion of the NL Superfund site ... safety procedures ... for hazardous waste sites must be followed," *id.*, ¶ 4, which will result in an additional $400,000 to $1.5 million in construction costs. *Id.*, ¶ 5.

In response, the EPA takes issue with the City's assumption that the 500 ppm standard

would apply to the area of road construction because the 500 ppm threshold applies only to residential property. Doc. No. 231 at 44 n. 37, 46–47. The EPA contends that the 16th Street construction zone would only be subject to the 1000 ppm non-residential threshold and, therefore, construction costs would be unaffected should the selection of the 500 ppm threshold be found arbitrary and capricious. *Id.* The Court finds this argument persuasive. There is nothing in the record to indicate that any non-residential property, including the proposed 16th Street corridor, would be subject to the 500 ppm threshold. As a result, there is no basis on which to conclude that the construction costs of the 16th street corridor would be greater because of the EPA's selection of the 500 ppm residential property threshold rather than a 1000 ppm threshold.

The City's next argument is that permitting the EPA to clean-up lead-contaminated soil will give the City's residents a false sense of security that could result in the residents failing to appreciate the health risk of lead-based paint in their homes.[11] The City argues that lead from all sources should be considered in addressing the health risks associated with lead in the environment.[12] However, CERCLA § 104(a)(3)(B), 42 U.S.C. § 104(a)(3)(B), precludes the EPA from conducting remedial actions in residential buildings.[13] In addition, whereas some residents could conceivably be lulled into a false sense of security by having their yards remediated, the failure to appreciate the threat of lead paint does not rise to the level of irreparable harm to public health or the environment. The most appropriate way to deal with this problem would be to educate the residents of the City about the health risks of lead paint rather than halt the clean-up of residential soil.[14]

Finally, the City argues that remediating residential soil with lead levels greater than 500 ppm will have no appreciable effect on the health of the City's residents. Doc. No. 228 at 3, 19–20. This may or may not be true, however, the City is essentially arguing that the EPA's remedy will leave residential soil too clean. This argument cannot support a claim of irreparable harm to public health or the environment.[15]

The Court is mindful of the City's frustration at its inability to halt the implementation of the EPA's remedy. However, as the Ninth Circuit observed in *McClellan Ecological Seepage Situation v. Perry,* 47 F.3d 325 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 51, 133 L.Ed.2d 16 (1995):

> The President shall not provide for a removal or remedial action under this section in remedial to a release or threat of release—
> > (B) from products which are part of the structure of, and result in exposure within, residential buildings or business or community structures; . . .

11. When the City and the PRPs sought to enjoin the EPA's clean-up in 1994, they expressed concern that the soil removal operations would increase the risk of exposure due to soil disturbance and resulting dust emissions. As part of the interim settlement agreement, the City and the PRPs were going to conduct an air sampling program at several residential properties while they were undergoing remediation in order to assess the extent of this risk. The materials submitted in support of the motions for injunctive relief do not discuss whether such a testing program was conducted or what results that program may have yielded.

12. The Court has repeatedly expressed its frustration with the failure of the parties to reach a global settlement that would incorporate remediation of both lead-based paint and lead-contaminated soil. The City and the PRPs made several offers to implement such a scheme, but the EPA claims that such an approach is not logistically feasible.

13. Section 104(a)(3) provides:

14. At oral argument it was revealed that a program was being established in conjunction with the Illinois Department of Public Health to assist the residents of Granite City to address the threat posed by lead paint.

15. The general rule is that a party seeking a preliminary injunction must demonstrate: (1) that it has no adequate remedy at law and will suffer irreparable harm if preliminary relief is denied; and (2) some likelihood of succeeding on the merits. *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11–12 (7th Cir.1992). Because the Court has concluded that it does not have subject matter jurisdiction to enjoin the EPA's remedial action and the City and the PRPs have failed to make a threshold showing of irreparable harm, the Court finds no need to address the likelihood of success on the merits.

We recognize that the application of Section 113(h) may in some cases delay judicial review for years, if not permanently, and may result in irreparable harm to other important interests. We must presume that Congress has already balanced all concerns and 'concluded that the interest in removing the hazard of toxic waste from Superfund sites' clearly outweighs the risk of irreparable harm.

*Id.* at 329 (quoting *Boarhead Corp. v. Erickson,* 923 F.2d 1011, 1018–19 (3d Cir.1991)).

Based upon the foregoing analysis, the Court concludes that it does not have subject matter jurisdiction to enjoin an ongoing remedial action under CERCLA § 113(h)(4). Even if the Court concluded otherwise, the City and the PRPs have not made a sufficient showing of irreparable harm to warrant injunctive relief.

## V. Constitutionality of CERCLA After *Lopez*

■ The City and the PRPs argue that even if the Court concludes that it does not have jurisdiction to enjoin the clean-up, the EPA is still acting without authority to conduct the clean-up because CERCLA is unconstitutional. Doc. No. 231 at 68. In support of this argument, the City and the PRPs rely on *United States v. Olin Corp.,* 927 F.Supp. 1502 (S.D.Ala.1996), which held that CERCLA liability is not retroactive and the application of CERCLA to the facts of that case exceeded Congress' authority under the Commerce Clause. *Id.* at 1533.[16] *Olin* based its holding upon the Supreme Court's decision in *United States v. Lopez,* — U.S. —, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), which struck down the Gun–Free School Zones Act of 1990 as an impermissible application of Congress' commerce power.

*Lopez* reiterated the principle that Congress may regulate commerce under the Commerce Clause in three broad categories.

"First, Congress may regulate the use of the channels of interstate commerce." *Id.* at —, 115 S.Ct. at 1629 (citing *United States v. Darby,* 312 U.S. 100, 114, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 256, 85 S.Ct. 348, 356–57, 13 L.Ed.2d 258 (1964)). "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Id.* (citing *Shreveport Rate Cases,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914); *Southern R. Co. v. United States,* 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911); *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359–60, 28 L.Ed.2d 686 (1971)). "Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relationship to interstate commerce, *i.e.,* those activities that substantially affect interstate commerce." *Id.* at — –—, 115 S.Ct. at 1629–30 (citing *Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968)). The Court initially ruled that the statute in question implicated only the third category. *Id.* at —, 115 S.Ct. at 1630.

The EPA argues that the activities regulated under CERCLA fall under all three categories. If in fact the activities regulated by CERCLA fall into one or both of the first two categories, the EPA concludes, CERCLA does not fall within the scope of the holding of *Lopez* and, therefore, it is not subject to the "substantially affects" test. Doc. No. 231 at 70. In reply, the City and the PRPs assert that the "Superfund Site at issue is neither a channel of commerce nor a person or object that moves through such channels." Doc. No. 235 at 32.[17]

■ The EPA contends that CERCLA falls under the first category because "CERCLA was enacted to address hazardous

---

**16.** Whether liability under CERCLA is retroactive has no bearing on the instant motions. Therefore, the Court will only address the *Olin* court's discussion of CERCLA's constitutionality under the Commerce Clause.

**17.** The Court notes that this statement of the issue is too narrow. The issue is not whether the

Superfund Site is a channel of commerce or an object that moves through channels of commerce. Rather, the proper focus is on whether the regulated activity—the improper disposal of *hazardous waste* and its subsequent clean-up— can be regulated under any of the three categories of *Lopez* and *Perez.*

substances generated primarily by manufacturers, like chemical companies and other industries, the products of which move in interstate commerce." *Id.* at 71. The first category is limited to the regulation of the misuse of channels of interstate commerce. *United States v. Wilson,* 73 F.3d 675, 680 n. 5 (7th Cir.1995) (citing *Perez,* 402 U.S. at 150, 91 S.Ct. at 1359–60). Examples include the shipment of stolen goods, 18 U.S.C. § 2314, *et seq.;* kidnapped persons, 18 U.S.C. 1201, *et seq.;* prostitutes, 18 U.S.C. § 2421, *et seq.,* and guns, 18 U.S.C. § 922, *et seq. Id.* CERCLA applies "primarily to the clean-up of leaking inactive or abandoned sites and to emergency responses to spills." *United States v. Akzo Coatings of America, Inc.,* 949 F.2d 1409, 1417 (6th Cir.1991) (citation and internal quotation marks omitted). Thus, CERCLA's principal function is to addresses the threat of hazardous waste *after* it has been transported in interstate or intrastate commerce. The regulation of present-day generators and transporters of hazardous waste is more closely regulated by the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6992k.

On the other hand, CERCLA imposes liability on those who transport hazardous waste which later must be cleaned up. CERCLA § 107(a), 42 U.S.C. § 9607(a)(4). CERCLA also specifically requires that hazardous substances listed under 42 U.S.C. § 9601(14) be listed and regulated as a hazardous material under the Hazardous Material Transportation Act. CERCLA § 306(a), 42 U.S.C. § 9656(a). However, as the Seventh Circuit pointed out in *United States v. Kenney,* 91 F.3d 884, 889 (7th Cir.1996), the first category is "limited to direct regulation of the channels of commerce." The court

reviewed several statutes that were upheld as permissible regulations of activities under the first category and noted that they all contained a jurisdictional element. *Id.* CERCLA contains no jurisdictional element and, although CERCLA regulates the transportation of hazardous waste through its liability provisions and by incorporating other statutes that directly regulate the channels of commerce, CERCLA does much more than regulate the channels of commerce. Viewed in its entirety, CERCLA establishes a comprehensive program establishing a mechanism for responding to releases of hazardous waste and assessing liability for such releases. Therefore, CERCLA is more properly viewed as regulating activities that "affects" commerce. *See Id.* (concluding that statute prohibiting possession of machine guns does not fall within the first category because it does more than regulate channels of interstate commerce).

With regard to the second category—regulation and protection of the instrumentalities of interstate commerce, or persons or things in interstate commerce—the EPA argues that "the pollution itself, and the media in which it is carried—including the air, soils, surface water, and groundwater—all move in interstate commerce or are channels of interstate commerce, and thus are necessarily subject to regulation by Congress under its commerce powers." Doc. No. 231 at 71. The EPA's argument is persuasive insofar as groundwater and surface water do not recognize state boundaries. One of CERCLA's highest priorities is the protection of surface water, CERCLA § 105(c)(2), 42 U.S.C. § 9605(c)(2),[18] and groundwater resources. CERCLA § 118, 42 U.S.C. § 9618.[19] The Supreme Court has explicitly recognized that

---

**18.** 42 U.S.C. § 9605(c)(2) provides:

In carrying out this subsection, the President shall ensure that the human health risks associated with the contamination or potential contamination (either directly or as a result of the runoff of any hazardous substance or pollutant or contaminant from sites of facilities) of surface water are appropriately assessed where such surface water is, or can be, used for recreational or potable water consumption. In making the assessment required pursuant to the preceding sentence, the President shall take into account the potential migration of

any hazardous substance or pollutant or contaminant through such surface water to downstream sources of drinking water.

**19.** 42 U.S.C. § 9618 provides:

For purposes of taking action under section 9604 or 9606 of this title and listing facilities on the National Priorities List, the President shall give a high priority to facilities where the release of hazardous substances or pollutants or contaminants has resulted in the closing of drinking water wells or has contaminated a principal drinking water supply.

ground water is an article of commerce. *Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 953–54, 102 S.Ct. 3456, 3462–63, 73 L.Ed.2d 1254 (1982) (recognizing that the "multistate character" of the Ogallala aquifer—underlying land in Colorado, Nebraska, Texas, New Mexico, Oklahoma, and Kansas—"confirms the view that there is a significant federal interest in conservation as well as in fair allocation of this diminishing resource."), and there is no doubt that surface waters, especially those that border on or traverse through more than one state, are an integral part of interstate commerce. *Cf. International Paper Co. v. Ouellette,* 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987); *City of Milwaukee v. Illinois and Michigan,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). Therefore, it is within Congress' commerce power to regulate activities that pollute these resources, *see Hodel v. Virginia Surface Mining and Reclamation Assoc.,* 452 U.S. 264, 281, 101 S.Ct. 2352, 2362–63, 69 L.Ed.2d 1 (1981), "even though the threat may come only from intrastate activities." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629.

Finally, the City and the PRPs rely on *Olin* to support their contention that CERCLA is not a proper exercise of Congress' power to regulate activities that substantially affect interstate commerce. In response, the EPA argues that "[o]n its face, CERCLA regulates economic activity and actors: the owners and operators, transporters, and generators responsible for the disposal of hazardous waste, which generally is a byproduct of manufacturing processes, and which often is disposed of as a commercial activity." Doc. No. 231 at 73.

*Olin* applied the reasoning of *Lopez* in holding that CERCLA did not regulate activities that substantially affect interstate commerce. *Olin,* 927 F.Supp. at 1533. *Lopez* struck down the Gun–Free School Zones Act of 1990, which provided that it was a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V). The Court reaffirmed that, in deciding whether a statute is a per-missible exercise of Congress' commerce power, the Court must determine whether Congress had a rational basis for concluding that a regulated activity substantially affected interstate commerce. *Lopez,* —— U.S. ——, 115 S.Ct. at 1629 (citations omitted); *accord United States v. Wilson,* 73 F.3d 675 (7th Cir.1995), *petition for cert. filed,* 64 U.S.L.W. 3669 (U.S. May 20, 1996) (No. 95–1523).

*Lopez* reviewed its prior commerce clause jurisprudence, observing that the Court had upheld a wide variety of congressional acts as having substantially affected interstate commerce, including the regulation of intrastate coal mining, *Hodel v. Virginia Surface Mining and Reclamation Assoc.* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); intrastate extortionate credit transactions (loan sharking), *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); restaurants utilizing substantial interstate supplies, *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); inns and hotels catering to interstate guests, *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 256, 85 S.Ct. 348, 356–57, 13 L.Ed.2d 258 (1964); and production and consumption of home-grown wheat, *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). *Lopez,* —— U.S. at ——, 115 S.Ct. at 1630. The Court noted that *Wickard,* "the most far reaching example of Commerce Clause authority over intrastate activity, involved economic activity in a way that the possession of a gun in a school zone does not." *Id.* The plaintiff in *Wickard,* Roscoe Filburn, harvested twelve more acres of wheat than he was permitted under the Agricultural Adjustment Act of 1938. *Id.* The Act "was designed to regulate the volume of wheat moving in interstate and foreign commerce in order to avoid surpluses and shortages, and concomitant fluctuation in wheat prices, which had previously obtained." *Id.* The *Wickard* Court upheld the application of the Act.

One of the primary purposes of the Act in question was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market. It can hardly be denied that a factor of such volume and variability as home-

consumed wheat would have a substantial influence on price and market conditions. This may arise because being in marketable condition such wheat overhangs the market and, if induced by rising prices, tends to flow into the market and check price increases. But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. Home-grown wheat in this sense competes with wheat in commerce.

*Wickard,* 317 U.S. at 128, 63 S.Ct. at 90–91, *quoted in Lopez,* —— U.S. at ——, 115 S.Ct. at 1630.

Comparing the Agricultural Adjustment Act of 1938 with the Gun–Free Schools act of 1990, the *Lopez* Court observed that the Gun–Free Schools Act was

a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

*Lopez,* —— U.S. at —— – ——, 115 S.Ct. at 1630–31 (footnote omitted).

The *Lopez* Court observed that § 933(q) contained "no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at ——, 115 S.Ct. at 1631. In *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), such a requirement in the former 18 U.S.C. § 1202(a), which made it a crime for a felon to "receiv[e], posses[s], or transpor[t] in commerce or affecting commerce ... any firearm[,]" was interpreted by the Court as requiring an "additional nexus to interstate commerce both because the statute was ambiguous and 'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state bal-

ance.'" *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631 (quoting *Bass,* 404 U.S. at 337, 349, 92 S.Ct. at 517, 523.)

The Court recognized that although "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce[,]" as part of the Court's "independent evaluation of constitutionality under the Commerce Clause [the Court] of course consider[s] legislative findings, and indeed even congressional committee findings, regarding effect on interstate commerce." *Id.* However, neither the statute nor its legislative history contained express congressional findings regarding the effects upon interstate commerce of gun possession in school zones. *Id.* (citations omitted). In the absence of such findings, the Court concluded that the "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at ——, 115 S.Ct. at 1634.

In *Olin,* 927 F.Supp. at 1532, the court stated that "*Lopez* requires: 1) that the statute itself regulate economic activity, which activity 'substantially affects' interstate commerce, —— U.S. at ——, 115 S.Ct. at 1630; and 2) that the statute include a 'jurisdictional element which would ensure, through case-by-case inquiry, that the statute in question affects interstate commerce.'" *Id.* at 1532. Having stated the rule of *Lopez* as such, the *Olin* court concluded that "[i]n applying *Lopez* to this case, the court finds it doubtful that the object of regulation *in this case* is 'economic activity.' i.e., 'commerce,' as that term is used in *Lopez.*" *Id.* (original emphasis). The court observed that the facility in question was no longer operating, thus "the fact remains that this suit seeks clean-up of real property." *Id.* at 1533. In the court's view, it was "clear ... that the law regulating real property has been traditionally a local matter falling under the police power of the states." *Id.* The court also noted that although environmental degradation generally may have an effect on interstate commerce, "it is not clear to this court that the degradation at issue *in this case* is necessarily 'economic activity' or that it has a 'sub-

stantial effect' on interstate commerce." *Id.* (emphasis added).

However, the court declined to base its holding on its opinion that "[i]t appears ... that CERCLA generally represents an example of the kind of national police power rejected by *Lopez.*" Rather, the court ruled that CERCLA failed to meet the second prong of the *Lopez* test—that *it must also be shown* that the statute has a 'jurisdictional element which would ensure, through case-by-case inquiry, that the [statute] in question affects interstate commerce.'" *Id.* (quoting *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631) (emphasis added). The court observed that CERCLA does not provide for case-by-case inquiry and, even if it did, "the particular inquiry in this case clearly demonstrates that the activity in question has virtually no effect on interstate commerce" because there was no evidence that the pollution in question traveled across state lines. *Id.*

In this Court's view, *Olin* misconstrues *Lopez. Lopez* does not *require* that a statute contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the [statute] in question affects interstate commerce." *Id.* (quoting *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631). The two-judge majority of the Seventh Circuit panel in *United States v. Wilson,* 73 F.3d 675 (7th Cir.1995), reached the same conclusion:

> In discussing the lack of a jurisdictional element in *Lopez,* the Court simply did not state or imply that all criminal statutes must have such an element, or that all statutes with such an element would be constitutional, or that any statute without such an element is per se unconstitutional. —— U.S. at ——, 115 S.Ct. at 1631. Read in context, the Court simply stated that the Gun–Free School Zones Act, unlike the statute in *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), lacks a jurisdictional element to "ensure" constitutionality, not to fulfill a prerequisite of constitutionality. See *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631.

*Id.* at 685; *see also Kenney,* 91 F.3d at 888 ("Congress does not confer power on itself by making legislative findings; conversely, it need not make findings to exercise its full enumerated powers.").

Moreover, had such a jurisdictional statement been *required,* the *Lopez* Court's inquiry regarding the legislative findings related to interstate commerce would have been superfluous; the Court's analysis would have been at an end once the deficiency was identified. *See Lopez,* —— U.S. at ——, 115 S.Ct. at 1631. Moreover, the Court explicitly stated that "Congress normally is not *required* to make formal findings as to the substantial burdens that an activity has on interstate commerce." *Id.* (emphasis added) (citing *McClung,* 379 U.S. at 304, 85 S.Ct. at 383–84; *Perez,* 402 U.S. at 156, 91 S.Ct. at 1362); *accord Wilson,* 73 F.3d at 684 (observing that *Lopez* stated that although Congress is not required to make specific findings, such findings would be helpful when it is not "visible to the naked eye" that the activity in question substantially affects interstate commerce) (quoting *Lopez,* —— U.S. at ——, 115 S.Ct. at 1632).

This Court also finds unpersuasive *Olin's* reliance on the argument that CERCLA is a usurpation of the states' police power to control real property. This argument was explicitly rejected by the Supreme Court in *Hodel v. Virginia Surface Mining and Reclamation Association,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981):

> A wealth of precedent attests to congressional authority to displace or pre-empt state laws regulating private activity affecting interstate commerce when these laws conflict with federal law. Moreover, it is clear that the Commerce Clause empowers Congress to prohibit all—and not just inconsistent—state regulation of such activities. Although such congressional enactments obviously curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important, the Supremacy Clause permits no other result.

*Id.* at 290, 101 S.Ct. at 2367 (citations omitted); *see also Kenney,* 91 F.3d at 891 (recognizing that "*Lopez* ... did not call into question the well-established principle that Congress may regulate conduct even though that conduct already violates state law.")

(quoting *Wilson*, 73 F.3d at 684) (internal quotation marks omitted).

The *Olin* court's focus on the intrastate nature of the pollution at issue in that case, which led to the conclusions that the regulated activity was not 'economic activity' and that the environmental degradation in that case did not have a substantial effect on interstate commerce, is also misplaced. *See Olin*, 927 F.Supp. at 1533. The *Lopez* Court cited several cases in which "we have upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1630. One of those cases was *Hodel*, which held that regulation of surface coal mining under the Surface Mining Control and Reclamation Act of 1977 ("Surface Mining Act") was a permissible exercise of Congress' commerce power. *Hodel* reaffirmed the principle that

> [t]he denomination of an activity as a "local" or "intrastate" activity does not resolve the question whether Congress may regulate it under the Commerce Clause. As previously noted, the commerce power "extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce."

*Id.* at 281, 101 S.Ct. at 2362 (quoting *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942)); *see also id.* at 277, 101 S.Ct. at 2360 ("[e]ven activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations.") (quoting *Fry v. United States*, 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975)) (internal quotation marks omitted). Moreover, because of the transitory nature of hazardous waste and the wide-ranging effects of its improper disposal, CERCLA's regulatory scheme would be undercut if intrastate disposal of hazardous waste was not regulated. *See Lopez*, —— U.S. at —— ——, 115 S.Ct. at 1630–31.

■ The EPA argues that the reasoning of *Hodel* is fully applicable to CERCLA. This is correct insofar as *Hodel* stands for the principal that Congress may regulate intrastate activities that cause environmental contamination. *See Hodel*, 452 U.S. at 282, 101 S.Ct. at 2363 (recognizing that "the Commerce Clause [is] broad enough to permit congressional regulation of activities causing air or water pollution, or other environmental hazards that may have effects in more than one State."). However, the Surface Mining Act, unlike CERCLA, had extensive Congressional findings demonstrating the effects of unregulated surface mining on interstate commerce. On the other hand, as previously discussed, a statute can survive scrutiny under the Commerce Clause without an expressed jurisdictional statement or extensive congressional findings. *See, e.g., Kenney*, 91 F.3d at 890–91 (holding statute prohibiting possession of a machine gun constitutional even though statute had "scant" legislative history and no jurisdictional statement).

CERCLA's legislative history is scant at best. The report of the Committee on Interstate and Foreign Commerce does not contain any specific findings regarding the effect of improper disposal of hazardous waste on interstate commerce. H.R.Rep. No. 96–1016(I), 96th Cong., 2d Sess., *reprinted in* 1980 U.S.C.C.A.N. 6119. However, the report estimates that it would cost between $13.1 and $22.1 billion to clean up all hazardous waste that poses a danger to public health and the environment. *Id.* at 20, 1980 U.S.C.C.A.N. at 6123. The report also summarizes the estimates of the cost to individual States of cleaning up specific sites. *Id.* Furthermore, the report reflects frustration with the EPA's enforcement of RCRA. The report cites the EPA's estimate that of the 77.1 billion pounds of hazardous waste produced each year, only ten percent is disposed of in an environmentally sound manner. *Id.*, 1980 U.S.C.C.A.N. at 6124.

The report of the Senate Committee on Environment and Public Works [20] states that releases of hazardous waste have "resulted in the contamination of drinking water and long-term contamination of wells, in massive fish kills, air pollution, loss of livestock and food products to contaminated drinking water and feed, and the destruction of wildlife." Senate Report No. 96–848 at 5, 96th Cong., 2d Sess. The Senate report also observed that "[s]pills have taken place because of transportation accidents involving pipelines, trucks, rail cars, and barges or tankers, and also non-transportation facilities such as storage tanks, holding lagoons and chemical processing plants." *Id.* In addition, the report notes that portions of Lakes Ontario and Erie have been closed to commercial fishing because of chemical contamination. *Id.* at 6.

Through CERCLA's legislative history, another court addressed the interstate nature of an activity addressed by CERCLA— "midnight dumping":

Significant among the pervasive industrial practices recognized by Congress is the problem of dumping wastes at improper, illegal or inappropriate sites, and the associated problem of "midnight," or clandestine dumping of chemical wastes at abandoned, remote or hidden locations. See, e.g., 1980 U.S.C.C. & A.N. at 6121–22 (describing various practices at selected sites); 126 Cong.Rec. S14,973 (daily ed. Nov. 24 1980) (remarks of Sen. Tsongas) (describing practices of " 'midnight dumpers' who dispose of toxic chemicals and hazardous materials in quarries, in streams, in forests, or spread them on open roads . . ."); id. at 14,973 (remarks of Sen. Ford). And, legislators recognized that the problem of "midnight dumping" frequently involves waste that is transported over state lines. See, e.g., 126 Cong.Rec. H9,461 (daily ed. Sept. 23, 1980) (remarks of Rep. Martin) ("because of the nature of clandestine

dumping operations [a] State . . . which does not generate a large volume of toxic waste, has been victimized as a dumping ground for waste from other States); 126 Cong.Rec. H11,798 (remarks of Rep. Edgar) (daily ed. Dec. 3, 1980) (" 'midnight dumpers' [have] trucked wastes from all over the Eastern Seaboard and dumped them illegally at various sites through [Pennsylvania]); 126 Cong.Rec. H9,448 (remarks of Rep. LaFalce) (daily ed. Sept. 23, 1980) (noting interstate scope of problem). This unfortunate history attests to the existence of a vast, unmonitored secondary toxic disposal market—one which, according to CERCLA's legislative history, weaves across state lines and reaches to every corner of this nation.

*Violet v. Picillo,* 613 F.Supp. 1563, 1571–72 (D.R.I.1985); *see also United States v. Chem–Dyne Corp.,* 572 F.Supp. 802, 809 (S.D.Ohio 1983) ("CERCLA was designed to complement existing federal regulations by providing emergency funds for the clean-up of inactive or abandoned hazardous waste sites as well as illegal releases, such as 'midnight dumping,' located across the nation in virtually every state."). Having considered the express findings of Congress and the legislative history set forth in *Violet,* the Court cannot say that Congress did not have a rational basis on which to conclude that the improper disposal of hazardous waste substantially affects interstate commerce.[21]

Moreover, the comprehensive nature of CERCLA's statutory scheme supports this conclusion. One of the fundamental deficiencies in the Guns in School Zones Act identified in *Lopez* was that the Act was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez,* ——

---

**20.** The Senate report accompanied S. 1480. The legislation that eventually became CERCLA was H.R. 7020, which was passed in lieu of S. 1480.

**21.** In addition to determining whether Congress rationally concluded that the activities regulated by CERCLA substantially affect interstate commerce, the Court must also determine whether the regulatory means chosen by Congress are reasonably adapted to a permissible end. *Wil-*

*son,* 73 F.3d at 680 n. 6 (citing *Hodel,* 452 U.S. at 276, 101 S.Ct. at 2360). The Court finds that CERLCA's regulatory scheme of imposing strict, joint and several liability against those who have improperly disposed of hazardous waste is reasonably adapted to the ends of cleaning up existing environmental degradation, preventing improper disposal of hazardous waste in the future, and recovering the cost of response and remedial actions.

U.S. at ——, 115 S.Ct. at 1630. Therefore, the Court concluded, the Act "cannot be sustained under our cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.* CERCLA, in contrast, establishes a comprehensive mechanism for responding to releases of hazardous waste and for assessing liability against those responsible for the pollution. The aggregate effects of the improper disposal of hazardous waste are significant and widespread.

Finally, the Act addressed in *Lopez* was "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez,* —— U.S. at —— – ——, 115 S.Ct. at 1630–31. CERCLA is a civil statute and, as shown by the Congressional records discussed above, the improper disposal of hazardous waste is economic activity. Hazardous waste is a by-product of numerous industries, from chemical manufacturing to dry cleaning. In addition to discouraging the improper disposal of hazardous waste through its liability provisions, CERCLA regulates the clean-up of hazardous waste sites by establishing clean-up schedules, § 116, 42 U.S.C. § 9619, and clean-up standards. § 121, 42 U.S.C. § 9621. The activities regulated by CERCLA have a much more direct impact on the economy than the somewhat speculative effect Roscoe Filburn's harvest of twelve too many acres of wheat had on the grain markets in *Wickard.* Pollution of surface water and groundwater affects the fishing industry, agriculture, livestock production, recreation, and domestic and industrial water supplies. The consequences of clandestine waste dumps have been dramatically demonstrated in places such as Love Canal and Times Beach, Missouri. In sum, CERCLA regulates economic activities which have a substantial affect on interstate commerce.

For the foregoing reasons, the Court concludes that Congress' regulation of the improper disposal of hazardous waste under CERCLA is a valid exercise of Congress' power under the Commerce Clause.

### Summary

The Court does not have subject matter jurisdiction to enjoin an ongoing remedial action under CERCLA. Accordingly, the motions for a temporary restraining order and preliminary injunction filed by defendants NL Industries, Inc., Johnson Controls, Inc., AT & T Corporation, Allied–Signal, Inc., Gould Electronics, Inc., and General Battery Company (Doc. No. 218), in which defendant Exide Corporation joins (see Doc. No. 227), and the City of Granite City (Doc. No. 220) are **DENIED.** In addition, the Court finds that CERCLA's regulation of the disposal of hazardous waste is a permissible exercise of Congress' power under the Commerce Clause.

**IT IS SO ORDERED.**