UNITED STATES of America, Plaintiff,

v.

GLIDDEN COMPANY, et al., Defendants.

No. 5:95 CV 1009.

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 30, 1997.

Arthur I. Harris, Office of U.S. Attorney, Cleveland, OH, James D. Freeman, Department of Justice, Environmental Enforcement Section, Washington, DC, Andrew Warren, Environmental Protection Agency, Chicago, IL, for U.S.

R. Russell O'Rourke, Marco E. Graves, O'Rourke & Associates, Cleveland, OH, David S. Hoffmann, Michael R. Blumenthal, McMahon, DeGulis, Hoffmann & Blumenthal, Cleveland, OH, for Defendants John Vencel Bohaty, Susan Bohaty, Ethel Bohaty, Belinda Bohaty.

Richard B. Whitney, Ann Owings Ford, Jones, Day, Reavis & Pogue, Cleveland, OH, David S. Hoffmann, McMahon, DeGulis, Hoffmann & Blumenthal, Cleveland, OH, for Defendant Glidden Co.

R. Russell O'Rourke, O'Rourke & Associates, Cleveland, OH, David S. Hoffmann, McMahon, DeGulis, Hoffmann & Blumenthal, Cleveland, OH, for Defendant 150 Acres of Land, More or Less, Located in Medina County, Ohio.

## ORDER

OLIVER, District Judge.

On May 5, 1995, Plaintiff, the United States ("Plaintiff"), brought an *in personam* action against the Glidden Company ("Glidden Company") and an *in rem* action against 150 Acres of Land, More or Less, Located in Medina County, Ohio ("Defendants" or "Bohatys"). Plaintiff seeks recovery for the costs that it incurred in its removal of hazardous wastes from Defendants' land under § 107 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* On November 7, 1995, Defendants filed an answer to Plaintiff's complaint and, on May 6, 1996, filed an amended answer to such com-

plaint. On August 5, 1996, Plaintiff entered into a Consent Decree with Glidden Company, resolving its claims against Glidden Company in the amount of $560,000 and thus leaving the Bohatys as the only defendant party to the action.

Plaintiff now moves the court for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Defendants also move for summary judgment in this case. For the reasons that follow, Plaintiff's Motion For Summary Judgment (Docket No. 37) is granted, and Defendants' Motion For Summary Judgment (Docket No. 49) is denied.

## I. FACTS

Except where noted, the following facts are not in dispute. Defendants are the current owners of the land at issue, 150 Acres of Land, More or Less, Located in Medina County ("Site"). Each of Defendants' individual interests in the land is as follows: Ethel Bohaty, 37/45; John J. Bohaty, Jr., 2/45; Barbara Bohaty, 2/45; Belinda Bohaty, 2/45; and Susan Bohaty, 2/45. Each Bohaty inherited her/his entire interest, except for Ethel Bohaty who purchased 12/45 of her interest. Ethel Bohaty purchased such interest from relatives who were seeking to sell their undivided interests in the Site. ·

Prior to Defendants' acquisition of the Site in 1986, John Bohaty, Sr., Ethel Bohaty's husband, operated a tractor parts and repair business there. When John Bohaty, Sr. died, Ethel Bohaty and her son John Bohaty, Jr. continued such business at the Site.

On March 30, 1987, employees of the Medina Township Fire Department observed numerous fifty-five gallon drums at the Site while fighting a grass fire on another portion of the Site. The fire department notified the Ohio Environmental Protection Agency ("Ohio EPA") of this discovery. In response, the Ohio EPA first visited the Site in 1987. During their visit, the inspectors from the Ohio EPA noted about 300 drums in various states of deterioration and took a sample from these drums. According to Defendants, the Ohio EPA inspectors met with two of the Bohatys, Ethel and John, before they left, and at that time, Ethel Bohaty requested that the Ohio EPA inspectors alert her to any problems that required attention. Instead of providing Ethel Bohaty with the requested information then, the inspectors informed her that they would ·contact her later. According to the Bohatys, no one contacted either Ethel or any other Bohaty after the inspection in 1987.

In 1989, another group of inspectors from the Ohio EPA visited the Site. Such visit was not a follow-up to the first visit in 1987. During this visit, the Ohio EPA inspectors noted that there was thick vegetation surrounding the drums and that such vegetation, at times, made it difficult to see the drums. Nonetheless, the inspectors stated that they had observed 200 to 300 drums at that time. However, the inspectors did not take any samples from the drums. Again, according to Defendants, Ethel Bohaty expressed her willingness to remedy any problems caused by the drums, but the Ohio EPA inspectors did not inform her or any of the Bohaty's ·of any potential waste hazards and never contacted them again after leaving in 1989.

The Ohio EPA inspectors, however, did ask the United States EPA ("U.S.EPA") during September of 1991 to investigate the Site. In October 1991, the U.S. EPA conducted an investigation of the Site. During this review, the U.S. EPA found approximately 400 drums on the Site. The drums were in deteriorating condition, and many of them had spilled their contents in the soil. The U.S. EPA took several samples from the drums, later determining that the drums contained hazardous wastes. Additionally, the U.S. EPA determined that further release from the drums was likely because of their deteriorating condition, that the drums presented a risk to anyone entering the property, and that because of the drums' location near a stream that runs directly into an adjacent neighborhood, any further release from the drums could impact the surrounding community.

On December 16, 1991, the U.S. EPA sent Ethel and John Bohaty, Jr. and their attorney a General Notice of Potential Liability Letter. The letter stated that the U.S. EPA

had determined that there was a release or threat of release of hazardous wastes at the Site, that the U.S. EPA was planning to spend public funds to investigate and address the releases, and that the Bohatys were potentially liable for all such costs as the owners of the Site. The letter also requested that Ethel and John Bohaty voluntarily agree to pay for the required response activities and that they respond to such request within five business days of their receipt of the letter. The Bohatys did not respond to this letter.

From January 15 to May 7, 1992, the U.S. EPA conducted an emergency removal action at the Site. During such action, the U.S. EPA performed the following activities: (1) the entire property was searched to locate potential hazardous substances; (2) drums were identified and recovered from various portions of the property; (3) drum contents were identified and sorted into waste streams; (4) contaminated soil was excavated and prepared for disposal; and (5) all wastes were disposed of off-site. U.S. EPA also removed approximately 450 empty drums from the Site. In performing these actions, U.S. EPA spent $720,641.43, plus prejudgment interest of $68,683.71. Additionally, the Department of Justice has incurred response costs of $62,313.81, plus prejudgment interest of $2,787.92.[1] Consequently, Plaintiff now wishes to place a lien in its favor upon all of the Site belonging to the Bohatys under § 107(1) of CERCLA ("CERCLA lien provision").

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . .

A fact is material if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense." Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir.1984).

Rule 56(e) specifies the way parties may establish those material facts when utilizing affidavits:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

The court then considers that evidence, along with the materials identified in Rule 56(c), in "the light most favorable to the party opposing the motion." Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (citations omitted).

When considering whether the evidence shows there is a genuine issue of material fact preventing entry of judgment as a matter of law, the court should rule "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Accordingly, "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In most civil cases, then, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict." Id. at 252, 106 S.Ct. 2505.

### III. LAW AND ANALYSIS

*A. The Basis For The Parties' Motions For Summary Judgment*

Plaintiff moves for summary judgment on the ground that Defendants are liable for the

---

1. Under § 104(b) of CERCLA, courts have held that the United States is entitled to recover its litigation costs from liable parties. *See United*

States v. American Cyanamid Co., 786 F.Supp. 152, 157 (D.R.I.1992) (citations omitted).

response costs that it incurred in cleaning up the hazardous wastes on Defendants' property under § 107 of CERCLA. In making such motion, Plaintiff first asserts that it has established the liability of the property in this *in rem* action by (1) establishing Defendants' liability for these costs under § 107(a) of CERCLA and (2) by establishing the liability of Defendants' property for these costs under § 107(1) of CERCLA. Second, Plaintiff argues that Defendants cannot avoid such liability under any of the defenses provided in § 107(b) of CERCLA. Lastly, Plaintiff asserts that the United States is entitled to recover all costs incurred at the Site because such costs are within the categories of costs recoverable under CERCLA and because Defendants cannot meet their burden of proving that such costs were inconsistent with the National Contingency Plan (NCP).

Defendants also move for summary judgment in this action. Defendants assert six grounds for their motion: (1) Plaintiff cannot establish the liability of the entire Site; (2) Defendants can avoid liability under the innocent landowner defense provided in § 107(b) of CERCLA; (3) the costs that Plaintiff incurred at the Site are inconsistent with the NCP; (4) the federal lien at issue is overbroad; (5) Plaintiff, through its actions, violated the Due Process Clause of the Fifth Amendment under the decision and analysis given in *Reardon v. U.S.*, 947 F.2d 1509 (1st Cir.1991); and (6) the application of CERCLA in this case is unconstitutional both facially and as applied because the statute has no provision for retroactivity and violates the Commerce Clause.

Consequently, the pertinent questions in this case are as follows:

(1) Are Defendants liable persons under § 107(a) of CERCLA?

(2) Is the Site liable property under § 107(*l*) of CERCLA?

(3) If the answers to both (1) and (2) are affirmative, can Defendants avoid liability under any of the defenses listed in § 107(b) of CERCLA?

(4) Is Plaintiff entitled to recover all costs incurred at the site?

(5) Did Plaintiff's actions violate the Due Process Clause of the Fifth Amendment?

(6) Is the federal lien at issue overbroad?

(7) Is the application of CERCLA in this case unconstitutional?

### B. Addressing the Questions Raised By The Parties's Motions For Summary Judgment

#### 1. Are Defendants liable persons under § 107(a) of CERCLA?

To establish the liability of a person under § 107(a), Plaintiff must show that (1) there has been a "release" or a "threatened release" of a "hazardous substance" on the property at issue; (2) such property is a "facility" within the meaning of § 107(a); (3) the release or threatened release has caused the United States to incur response costs; and (4) the person is a responsible party under one or more categories set forth in Section 107(a)(1)–(4) of CERCLA. *See* 42 U.S.C. § 9607(a). Plaintiff asserts that it can demonstrate all four of these factors based on the undisputed material facts.

##### a. There has been a release or a threatened release of hazardous substances at the Site.

A "release" is defined in § 101(22) of CERCLA as "any spilling, leaking, pumping, ... dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22). According to Plaintiff, during its inspection of the Site, Plaintiff identified approximately 1,000 abandoned drums, approximately 550 of which had contents. (Plaintiff's Motion For Summary Judgment, p. 17 (citing the On–Scene Coordinator's Report, p. 10)). Such drums were in a deteriorated condition, "many having spilled their contents into the around" and posing a further threat of release at the Site. *Id.* (citing the on–Scene Coordinator's Report, p.5). The contents of these drums included flammable liquids, flammable solids, paint waste solids, PCB-containing wastes, and soil containing pesticides, all of which qualify as hazardous substances under CERCLA. *Id.* For the purposes of these

motions only, Defendants do not dispute the fact that there was a release or threat of release at the Site. Thus, Plaintiff has successfully established the first factor needed to establish Defendants' liability.

### b. The Site is a facility within the meaning of § 107(a).

A facility is defined in § 101(9) of CERCLA as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). In the present case, the only area where hazardous substances have "come to be located" is on Parcel 1 (out of 3) of the Site. Consequently, Defendants assert that only part of the Site, Parcel 1, is a facility because Plaintiff found no release or threat of release on Parcels 2 and 3. Plaintiff does not dispute the fact that a release or threat of release occurred on Parcel 1 only, but contends that the Site in its entirety is a facility. Plaintiff states two grounds for such argument. First, Plaintiff argues that Parcel 1 is part of a larger piece of property that is to be treated as one single unit. Proof of such intended treatment lay in the fact that Defendants "acquired the three parcels through instruments that transferred ownership as a single unit, at a single time, for a single price." (Plaintiff's Motion For Summary Judgment, p.25). Second, Plaintiff argues that it would contrary to the goals of CERCLA to give effect to a property owner's artificial separation of contiguous land.

To determine whether the Site is a facility within the meaning of § 107(a), the court must first decide whether the three parcels of the Site are to be treated as individual units or as one single unit. In making this decision, the court turns to two pieces of information: (1) case law addressing similar questions in asset forfeiture cases and (2) the policy for creating CERCLA.

(1)

While there is no federal case law directly addressing this issue, there are some federal asset forfeiture cases that shed light on the matter. These cases indicate that the court should treat Defendants' three parcels on the Site as one unit. One such case is *United States v. Smith*, 966 F.2d 1045 (6th Cir.1992).

In *Smith*, the court there had to decide if it would treat a farm with four tracts as four separate units or as one individual unit in an asset forfeiture case. In making its decision, the court turned to the holdings of two civil forfeiture cases under 21 U.S.C. § 881, and concluded from those cases that "the property must be defined by the recorded instruments and documents that created the defendant's interest in the property." *Id.* (citing *United States v. Santoro*, 866 F.2d 1538, 1543 (4th Cir.1989); *United States v. Reynolds*, 856 F.2d 675, 677 (4th Cir.1988)). Because the defendant in that case acquired each of his tracts of land through separate deeds, the court treated each tract separately for forfeiture purposes. Another relevant case is *United States v. Myers*, 21 F.3d 826 (8th Cir.1994). In that case, the court there also defined the property according to the instruments and the documents that created an interest in the property. In so doing, the court there held that, because Myers' property was contiguous and was sold to him as a whole in a single instrument, it was to be treated as one single parcel of property, despite the fact that his real estate contract for the property utilized its historical, two-tract description. *Id.* at 830.

In the present case, Defendants "acquired the three parcels through instruments that transferred ownership as a single unit, at a single time, for a single price." (Plaintiff's Motion For Summary Judgment, p. 25). Furthermore, Defendants' site is contiguous. Consequently, under the logic of asset forfeiture cases, Defendants' Site must be treated as a single large unit, not three individual parcels, in spite of the fact that it is described as three parcels in the transferring instruments.

(2)

Arguably, the court's reliance on criminal forfeiture cases is inappropriate, because the CERCLA lien provision is a civil forfeiture statute designed to recover response costs, not a criminal penalty or fine. An examination of courts' past application of CERCLA, however, reveals that such reliance is not improper. After all, CERCLA

"is construed liberally to avoid frustrating its beneficial legislative purposes. Liberal construction enables the federal government to respond promptly and effectively to the problems of hazardous waste disposal." *United States v. DiBiase Salem Realty Trust,* 1993 WL 729662, at *4 (D.Mass. Nov. 19, 1993).

In the present case, a liberal construction of the CERCLA lien provision is necessary to effect the statute's goals. As Plaintiff correctly argues in its motion, "[i]f property owners could ... assert that only the parcels [regardless of how such property was acquired] that actually housed hazardous substances" were facilities within the meaning of CERCLA § 107(1), such owners could, in effect, circumvent the goals of CERCLA by limiting the effectiveness and strength of the lien provision as a cost recovery tool. The court does not think that Congress intended to give such power to land owners under CERCLA. Thus, the court finds that Defendants' property should be treated as one single unit. The entire Site is a facility within the meaning of § 107(a). Thus, Plaintiff has successfully satisfied the second factor needed to establish Defendants' liability.

*c. Plaintiff has incurred response costs as a result of a release or threatened release of hazardous substances at the Site.*

The U.S. EPA incurred direct costs of $661,057.43 and indirect costs of $59,584, plus $68,683.71 in prejudgment interest for its response action at the site. This amount included expenditures for inspecting and investigating the Site; for sampling and analyzing materials at the Site; and for planning, supervising, and carrying out removal action. The Department of Justice has also incurred costs of $62,313.81, plus $2,787.92, as a result of this response action. Defendants do not dispute the fact that the U.S. EPA and the Department of Justice have incurred these costs. Thus, Plaintiff has successfully satisfied the third factor needed to establish Defendants' liability.

*d. Defendants are within a category of persons liable to the United States under § 107(a) of CERCLA*

Persons are liable for response costs under § 107(a) of CERCLA if they are either (1) the owner and operator of a vessel or a facility; (2) any person who at the time of the disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of; (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person; and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance. *See* 42 U.S.C. § 9607(a).

Defendants are the current owners of the Site and thus are liable under § 107(a)(1) of CERCLA. Defendants do not dispute this fact. Because there is no dispute as to Defendants' liability under § 107(a)(1), it is unnecessary to discuss whether and how Defendants fit into the categories described in § 107(a)(2)–(4). Plaintiff has successfully established the fourth factor needed to establish Defendants' liability.

In all, Plaintiff has established all four factors necessary under § 107(a) and in doing so, has established the liability of Defendants for the response costs.

*2. Is the Site liable property under § 107(1) of CERCLA?*

To establish the liability of property in an *in rem* action under § 107(1) of CERCLA, Plaintiff must show that (1) the property is owned by a person who is liable to the United States pursuant to § 107(a)(1)–(4) of CERCLA; and (2) the property is subject to or affected by removal or remedial action.

*a. The property is owned by persons who are liable to the United States under § 107(a) of CERCLA.*

As noted above in Section III.B(1)(d), the Bohatys are the current owners of the Site, and as such, are liable to the United States under § 107(a) of CERCLA.

*b. The Site was subject to or affected by the removal action.*

A "removal" is defined in § 101(23) as including "the cleanup or removal of released

hazardous substances from the environment, such actions as may be necessar[ily] taken in the event of the threat of release of hazardous substances into the environment, [and] such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material," 42 U.S.C. § 9601(23). Additionally, under § 104(a)(1) of CERCLA, whenever "any hazardous substance is released or there is a substantial threat of such release into the environment," the U.S. EPA is authorized to "remove or arrange for the removal of ... such hazardous substance." 42 U.S.C. § 9604(a).

■ In the present case, Defendants admit that Parcel 1 of the Site was subject to and affected by a removal action, but argue that Parcels 2 and 3 were not subject to such action because no hazardous waste was removed from these parcels. As a result, they state, Plaintiff's lien may only attach to Parcel 1 of their Site. The court, however, rejects this argument and finds that a removal action also occurred on Parcels 2 and 3 of the Site. As stated earlier, a removal action includes "such action necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23).

Here, the U.S. EPA inspected the entire Site, not only Parcel 1, in an effort to "monitor, assess, and evaluate the release or threat of release of hazardous substances." The fact that a release of hazardous substances was found only on Parcel 1 is irrelevant here; the Government need not find waste on each parcel it investigates. Such a requirement would only work to circumvent the goals of the CERCLA lien provision. The provision was created as a means of (1) facilitating recovery of response costs by the Government and (2) encouraging the Government to clean up dangerous wastes, even where the responsible parties refuse to do so. *See* 42 U.S.C. §§ 9607(1), 9604(a). If the CERCLA lien provision allowed the Government to recover response costs only where its actions uncovered hazardous wastes, the Government would have incentive to pursue investigations only where it was sure to uncover waste on an owner's land. In essence, the Government would be discouraged from investigating all land areas that pose a threat to society. It is certain that Congress did not intend for this result to occur, but rather intended to encourage government investigations of all suspect sites. *See* H.R.Rep. 96–1016, 96th Cong., 2d. Sess., *reprinted in* 1980 U.S.C.C.A.N. 6120. Thus, the court finds that a removal action also occurred on Parcels 2 and 3 of the Site.

In addition to the reasons stated above, the court also finds that a lien may be attached to Parcels 2 and 3 of the Site for the reasons stated in Section III.B(1)(b).

Plaintiff has successfully established the liability of Defendants' property under § 107(1) of CERCLA.

### 3. Can Defendants avoid liability under § 107(b) of CERCLA?

Even though Plaintiff has established the liability of Defendants and their property, Defendants can avoid such liability if they can assert any of the defenses provided in § 107(b) of CERCLA. This subsection states:

There can be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by

(1) an act of God;

(2) an act of war;

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant established by a preponderance of evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or

(4) any combination of the foregoing paragraphs.

42 U.S.C. § 9607(b).

Defendants argue that they can assert the third party defense or the "innocent landowner" defense and thereby avoid liability under § 107 of CERCLA. Plaintiff, on the other hand, contends that Defendants cannot assert such defenses because they cannot prove that (1) the release or threat of release of hazardous substances and the resulting damages were caused solely by an act or omission of a third party; (2) the third party's act or omission did not occur in connection with a contractual relationship with the Defendants; (3) they exercised due care with respect to the hazardous substance; and (4) they took precautions against the third party's foreseeable acts or omissions and the foreseeable consequences resulting therefrom.

### a. *Defendants cannot assert the third party defense or the "innocent landowner" defense.*

The court finds that Defendants cannot assert such defenses because they cannot prove that (1) the release or threat of release of hazardous substances and the resulting damages were caused solely by an act or omission of a third party; (2) the third party's act or omission did not occur in connection with a contractual relationship with the Defendants; (3) they exercised due care with respect to the hazardous substance; and (4) they took precautions against the third party's foreseeable acts or omissions and the foreseeable consequences resulting therefrom.

### (1) *Defendants cannot show that the release or threat of release of hazardous substances at the Site were caused solely by a third party.*

As defined in § 101(22) of CERCLA, a "release" includes the spilling, leaking, and escaping of material into the environment as well as the abandonment of drums or other receptacles containing hazardous substances. *See* 42 U.S.C. § 9601(22). Plaintiff contends that the release of hazardous substances at the Site is due in part to Defendants' failure to remove or stabilize the drums on their property, and as a result, the release or threat of release of hazardous substances at their Site was not caused solely by a third party. Defendants respond to this argument by claiming that the act or omission that caused such release was the actual disposal or placement of barrels on the Site and that they had nothing to do with such act or omission.

■ In considering these opposing arguments, the court finds that Defendants did play a role in the release or threat of release of hazardous substances at the Site. In this case, Defendants can establish that drums were placed on the Site prior to their ownership, but they cannot show that all the *spilling* and *leaking* from such drums occurred before their ownership. In fact, the U.S. EPA inspectors noted during their 1991 investigation that the drums at the Site were "[r]usted, deteriorating, leaking, on their sides, spilled open." (Renninger Deposition, p. 137). Defendants were definitely aware of this release as of December 1991. Despite such knowledge, however, they did not act to remove or stabilize the leaking and spilling drums or state any intentions to do so in the future. Consequently, it can be said that their failure to remove or stabilize the drums did *contribute* to the continued leaking and spilling of hazardous wastes at the Site. Defendants cannot show that the release or threat of release at the site was caused solely by a third party.

### 2) *Defendants cannot demonstrate that the instruments through which they acquired title do not constitute a contractual relationship.*

Although Defendants cannot show that the release of waste at the Site was solely caused by a third party, they can still attempt to assert the innocent purchaser defense by demonstrating that a third party's "act or omission [causing the release of hazardous wastes at the Site] occur[red] in connection with a contractual relationship, existing directly or indirectly with" them. 42 U.S.C. § 9607(b)(3). Defendants argue that they can demonstrate this factor and all other

necessary factors to assert the innocent land-owner defense.

To determine if Defendants can successfully demonstrate this factor, the court must first decide whether the release at the Site occurred in connection with a contractual relationship with Defendants. A "contractual relationship" is defined in § 9601(35)(A) as including but not limited to "land contracts, deeds, or other instruments transferring title or possession unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility," and if one or more of the following circumstances are established:

(a) that at the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility; or

(b) that the defendant acquired the facility by inheritance or bequest.

Given this definition, the court, in its analysis, must provide an answer to the following two questions: (1) did Defendants acquire the Site after the disposal of hazardous substances had occurred there; and (2) if the answer to question (1) is affirmative, were Defendants unaware or of such disposal on the Site, or did they acquire such Site by inheritance or bequest?

*(1)*

Plaintiff argues that the disposal of hazardous substances occurred after Defendants acquired the Site. In making this argument, Plaintiff points to CERCLA's definition of "disposal," which states that disposal includes the "leaking" or "spilling" of hazardous substances, and asserts that leaking and spilling occurred on the Site after Defendants' acquisition of the property in 1986. Additionally, Plaintiff notes that such leaking and spilling was not the product of human conduct, but that such fact is irrelevant because leaking and spilling under CERCLA does not require active human conduct. Defendants, on the other hand, argue that the disposal of hazardous substances occurred after they acquired the Site. In making their argument,

they also point to CERCLA's definition of "disposal," but claim that while such definition does include "leaking" and "spilling," it was not intended to include any leaking and spilling that occurred free of human conduct.

 To determine how it will interpret the term "disposal," the court now looks to congressional intent. Is disposal only the result of active human conduct? Or can it also be the result of the passive spreading of waste? In looking at such intent, the court finds that the term disposal in CERCLA does not require active human conduct. The court asserts that such interpretation of disposal is consistent with CERCLA's goal "to encourage the cleanup of hazardous waste conditions." *Nurad, Inc. v. William E. Hooper & Sons Company,* 966 F.2d 837 (4th Cir.1992). The court notes that a more restrictive definition of disposal would frustrate the very purpose of the statute, because under a more restrictive definition of disposal, "an owner could avoid liability simply by standing idle while an environmental hazard festers on his proper. Such owner could insulate himself from liability by virtue of his passivity, so long as he transfers the property before any response costs are incurred." *Id.* at 845. A regime "which rewards indifference to environmental hazards and discourages voluntary efforts at waste cleanup cannot be what Congress has in mind." *Id.* Thus, the court interprets the term disposal broadly, holding that it does not require active human conduct as its impetus.

 Because the court finds that the term disposal must be interpreted broadly, it cannot be said that Defendants acquired the Site after the disposal of hazardous wastes on it, because leakage and spillage occurred on the Site as late as 1991—five years after Defendants acquired such property. In sum, Defendants have failed to show that the instruments through which they acquired title do not constitute a contractual relationship.

*(b)*

Because Defendants have failed to show that they acquired the Site after disposal occurred there, the court need not determine (1) whether Defendants either acquired the

Site by inheritance or bequest or (2) whether Defendants, at the time they acquired the Site, knew or had reason to know that any hazardous substances had been disposed of on such facility.[2]

*(3) Even if Defendants could demonstrate that they acquired the Site after disposal had occurred there, they still could not assert the innocent landowner defense.*

█ Furthermore, even if Defendants could show that they acquired the Site after the disposal of hazardous wastes had occurred, they still could not assert the third party defense granted under § 107(b) because they cannot demonstrate that (1) they exercised due care with respect to the hazardous substances; or (2) they took appropriate precautions with respect to the drums.

In the present case, Defendants admit that they did nothing to clean up the waste on their Site. They took no action to assess the potential for waste on the Site after the inspections made by the Ohio EPA in 1987 and 1989. Although Ethel Bohaty made inquiries about the Site during the Ohio EPA's investigations, she and her family members made no further attempts to contact the Ohio EPA about the results of its inspections of the Site or its intended future actions for the Site. The court thinks a reasonable person would have made such inquiries; any reasonable person would want to be informed about the status of her/his property. Moreover, even after the U.S. EPA notified Defendants about the hazardous substances on the Site and gave them sufficient opportunity—one full month—to take some action at the Site, Defendants did nothing. They did not even respond to Plaintiff's notice of liability, not even so much as to say that they wished to assert the innocent landowner defense. "In no circumstances can 'no care' be considered 'due care.'" *United States v. DiBiase Salem*

*Realty Trust, et al.,* 1993 WL 729662, at *6 (D.Mass. Nov.19, 1993). Thus, Defendants cannot demonstrate that they exercised due care or that they took precautions with respect to the waste at the Site.

*4. Is Plaintiff entitled to recover all costs incurred at the Site?*

█ CERCLA authorizes the Plaintiff to recover from liable parties "all costs of removal or remedial action incurred by the United States ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a). In the present case, Plaintiff asserts that it is entitled to recover all the costs incurred during its removal action at the Site because the costs incurred at the Site are within the categories of costs recoverable under CERCLA and because Defendants cannot meet their burden of proving that such costs were inconsistent with the national contingency plan ("NCP"). Defendants do not contest the fact that Plaintiff incurred such costs during its removal action, but assert that these response costs are not consistent with the NCP. "The burden of proving inconsistency with the NCP is on the defendants." *United States v. American Cyanamid Co.,* 786 F.Supp. 152, 161 (D.R.I. 1992) (citations omitted). To meet that burden, the defendants must identify a particular provision in the NCP with which a specific response action was inconsistent. *United States v. American Cyanamid Co.,* 786 F.Supp. 152, 161 (D.R.I.1992) (citations omitted). "Even if a response action is shown to be inconsistent with the NCP, defendants still have not triumphed. To establish the amount of costs to be disallowed, 'the defendants have the burden of demonstrating that the clean-up, because of some variance with the NCP, resulted in demonstrable excessive costs.'" *Cyanamid,* 786 F.Supp. at 161 (citing *O'Neil v. Picillo,* 682 F.Supp. 706, 729

**2.** The court, however, notes that if the Bohatys had shown that they acquired the Site after disposal had occurred on it, all of them except for Ethel Bohaty would have demonstrated that the instruments through which they acquired title did not constitute a contractual relationship, because they had all acquired the facility by inheritance or bequest. *See* 42 U.S.C. § 9607(b)(3).

Unlike her relatives, though, Ethel Bohaty would have to show more than the fact that she

acquired the facility by inheritance or bequest. Because Ethel Bohaty purchased 12/45 of her 37/45 interest in the Site, she would have to show that she acquired 12/45 of the facility without knowledge or reason to know that hazardous substances had been disposed of on the Site. Because Defendants failed to show that they acquired the Site after disposal occurred on it, the court finds it unnecessary to decide if Ethel Bohaty could meet this requirement.

(D.R.I.1988), *aff'd*, 883 F.2d 176 (1st Cir. 1989)). Defendants attempt to demonstrate all of these things. In so doing, they claim that the costs incurred as a result of the removal of empty drums and a large underground storage tank, which contained no hazardous wastes, from the Site are inconsistent with the NCP because the empty drums and storage tank posed no threat to the public or environment and therefore their removal was an unnecessary and excessive clean-up act.

■ The court, however, rejects Defendants' arguments and finds that Plaintiff's removal action is not inconsistent with the NCP, because (1) the removal of non-hazardous waste from a site is not prohibited by the NCP; (2) the Plaintiff had valid reasons for removing the empty drums and tank from the Site; and (3) Defendants have failed to show that the Plaintiffs' removal of such materials resulted in demonstrable excessive costs.

The costs for the removal of the empty drums and tank from the Site are not inconsistent with NCP because such costs are not even mentioned, much less prohibited, by the NCP. The 1982, 1985, and 1990 NCPs have been codified at 40 C.F.R., Part 300. *See United States v. American Cyanamid Co.*, 786 F.Supp. 152, 157 n. 3 (D.R.I.1992). This part sets forth a list of factors for determining the appropriate extent of action in removal actions:

(i) Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants;

(ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other build storage containers, that may pose a threat of release;

(iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface that may migrate;

(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or to be released;

(vi) Threat of fire or explosion;

(vii) The availability of other appropriate federal or state response mechanisms to respond to the release; and

(viii) Other situations or factors that may pose threats to public health or welfare of the United States or the environment.

40 C.F.R. § 300.415(b)(2). As one can see, none of these provisions either mention or prohibit the removal of non-hazardous substances from a site. Thus, Plaintiff's action in removing the empty drums and tank cannot be inconsistent with the factors set forth in the NCP. Moreover, the factors listed in such plan are only factors to be *considered* in a removal action. As a review of the On-Scene Coordinator's Report shows, "the U.S. EPA expressly considered the factors set forth in this section when conducting a removal action." Plaintiff's Reply Memorandum in Support of Motion for Summary Judgment, p. 23. Thus, Plaintiff's actions were consistent with the NCP.

Additionally, Plaintiff had valid reasons for removing the empty drums and tank from the Site. "If the drums are left at a site when the removal is completed, 1) local officials or residents might believe that the drums were inadvertently left at a site and request a return visit, 2) the empty drums might be used for subsequent disposal, and 3) the presence of empty drums would make it more difficult to determine if disposal subsequent to the removal action has occurred. As any of these events could require U.S. EPA investigation, it is more cost effective to address empty drums as part of the initial removal action." (Plaintiff's Reply Memorandum in Support of its Motion for Summary Judgment, p. 23 (citing Renninger Declaration, ¶ six)).

■ Lastly, even if the clean-up costs incurred at the Site were inconsistent with the NCP, Defendants' argument still would not prevail because Defendants failed to show that such costs were demonstrably excessive. All that Defendants have shown is that Plaintiff did not minimize its response costs at the Site. "CERCLA imposes no obligation on the United States to minimize its response costs for the benefit of responsible parties who are liable for the costs." *Cyan-*

*amid,* 786 F.Supp. at 161 (citations omitted). Moreover, while Plaintiff did not minimize its costs in the response action, it did follow the "normal procedure" of "following a bid situation for the most cost effective and proper way to dispose of waste streams." (Renninger Deposition, p. 261–62). In sum, Plaintiff's response costs are not inconsistent with the NCP.

### 5. Did Plaintiff's actions violate the Due Process Clause of the Fifth Amendment?

 The court finds that Plaintiff's actions did not violate the Due Process Clause of the Fifth Amendment. The Supreme Court has established a two-part analysis of due process challenges to statutes which involve property interests: (1) did the taking of a significant property interest occur?; and (2) if so, what process is due under the circumstances? *Reardon v. United States,* 947 F.2d 1509, 1516 (1st Cir.)

### (1)

The court finds that Plaintiff did deprive Defendants of a significant property interest. In reaching this conclusion, the court relies on the decisions in *Connecticut v. Doehr,* 501 U.S. 1, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991) and *Reardon v. United States,* 947 F.2d 1509 (1st Cir.). In *Doehr,* the Court held that the attachment lien on the plaintiff's real property deprived him of a significant property interest within the meaning of the Due Process Clause. The Court stated:

> For a property owner like Doehr, attachment ordinarily clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause.

*Doehr,* 501 U.S. at 11, 111 S.Ct. 2105. In *Reardon,* the court there held that the lien on real property created by 42 U.S.C. § 9607(1) had substantially the same effect as the attachment lien in *Doehr;* consequently, such lien amounted to the deprivation of a significant property interest.

 In light of these decisions, the court here can only conclude that the lien placed on Defendant's Site amounts to the deprivation of a significant property interest protected by the Fifth Amendment. Thus, the court now turns to the second part of the Supreme Court's two-part analysis: what process is due under the circumstances?

### (2)

The Supreme Court has set forth a balancing test for determining what process is due: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Consequently, in determining whether Defendants were afforded sufficient due process, the court must consider the factors of this balancing test.

In so doing, the court first turns to Defendants' affected private interest and finds that Plaintiff's action had a impact on such interest. Here, like the lien in *Reardon,* the lien has clouded title and impaired Defendants' ability to sell the property. As stated in *Reardon,* such effects are significant—despite the fact that Defendants maintained possession of the Site and were still able to operate their business on the Site. *See Reardon,* 947 F.2d at 1518, 1519.

Second, the court addresses the issue concerning the risk of erroneous deprivation of Defendants' interest. In so doing, the court examines the procedures used to deprive Defendants of their property and finds that such procedures allowed little room for erroneous deprivation. In reaching this conclusion, the court first considers whether the lien at issue is subject to " 'uncomplicated matters that lend themselves to documentary proof,' thereby minimizing the risk that the lien would be wrongfully filed." *Id.* at 1519 (citations omitted). Like the court in *Reardon,* this court holds that while some issues,

such as the ownership of the property and the presence of hazardous substances, are uncomplicated matters, there are enough issues, such as those essential to CERCLA's innocent land owner defense, that are highly factual by nature. Thus, the risk of an erroneous filing of the CERCLA lien in this case is suspect. As a result, the court must consider what procedural safeguards, if any, were provided against a potential erroneous filing.

Unlike the court in *Reardon*, the court here finds that sufficient procedural safeguards were provided to prevent an erroneous filing in this case. As the court in *Reardon* suggested, the imposition of the federal lien would have met due process requirements had claimants received notice and a hearing prior to perfection of the lien. *See id.* at 1523. Here, in addition to receiving notice of an intent to perfect the lien, Defendants were provided with an informal hearing before a neutral U.S. EPA official at which Defendants provided information and materials on whether the U.S. EPA had a reasonable basis to perfect a lien. Consequently, under *Reardon*, the lien here would have met due process requirements. Defendants do not dispute this point, but contend that their hearing was inadequate because (1) their hearing officer was an employee of the U.S. EPA and thus not a neutral magistrate; and (2) such hearing was only a "sham" hearing as indicated by Plaintiff's filing of this action before the hearing occurred.

The court rejects Defendants' arguments on the following grounds. First, Defendants' hearing was conducted by a Regional Judicial Officer. Although an employee of the U.S. EPA, such officer's neutrality has been ensured by a number of institutional safeguards. For example, a Regional Judicial Officer "shall not be employed by the Region's Enforcement Division or by the Regional Division directly associated with the type of violation at issue in the proceeding." 40 C.F.R. § 22.04(b)(2). This safeguard was met here. Additionally, such officer "shall not have performed prosecutorial or investigative functions in connection with any hearing in which he serves as a Regional Judicial Officer or with any factually related hearing." *Id.* This safeguard was also met here. Second, the court does not find that Defendant's hearing was only a sham hearing. True, Plaintiff did file this action before the hearing officer made her final determination on the lien, but such filing occurred under exigent circumstances. Had Plaintiff not filed its action before such determination, its action against Defendants would have been barred by the statute of limitations. As stated in *Reardon*, "the absence of notice and a hearing may be justified by exigent circumstances." *Id.* at 1522. Thus, the court finds that, even if filing of Plaintiff's action had the same effect as the filing of a lien, Plaintiff's actions were justified. Lastly, as the Plaintiff argues, the court believes that the filing of the action actually added protection by giving Defendants another forum in which to challenge the lien. In sum, the procedures used to determine the reasonableness of placing a lien on Defendants' property sufficiently protected them against the risk of an erroneous lien filing.

Third, the court examines the issue concerning the government's interest in the Site and finds that the government has a substantial interest in the Site. Under 42 U.S.C. § 9607(1), a federal lien is created by operation of law before the Government files a notice of lien. However, that lien attaches to particular real property only if (1) the property is owned by a person who is liable to the United States for CERCLA clean-up costs, and (2) the property is "subject to or affected by a removal or remedial action." 42 U.S.C. § 9607(1). As concluded in Section IV.B(1) and (2), Plaintiffs have established both of these factors. Thus, the court finds that Plaintiff has a substantial, recognized interest in the property.

Additionally, the court finds that Plaintiff has a substantial interest in the property because of its strong interest in perfecting federal liens to facilitate the recovery of its response costs at hazardous waste sites. As argued by Plaintiff, if it were unable to perfect a lien on property, subject to or affected by a response action, "it could not prevent responsible parties from avoiding responsibility for contamination on their property by selling or encumbering the property prior to

a formal judicial determination on liability and post-judgment remedies." (Plaintiff's Response to Defendants' Motion For Summary Judgment, p. 25). Such result cannot be the intent of Congress. Thus, the court finds that Plaintiff has a substantial interest in Defendant's Site.

■ In sum, although Defendants' private interest was significantly affected by Plaintiff's action, the court still finds that Defendants were afforded sufficient due process. The procedures that Plaintiff used to place a lien on Defendants's property effectively minimized the risk of erroneous deprivation, and Plaintiff has a substantial interest in Defendants' property. Thus, the balancing test set forth in *Mathews* tilts in Plaintiff's favor.

#### 6. Is the federal lien overbroad?

■ Defendants argue that the federal lien at issue is overbroad. They argue that instead of encompassing the entire Site, it should only cover Parcel 1 of the Site as hazardous substances were located only on that portion of the Site. The court finds that the federal lien is not overbroad, because all three parcels together constitute one facility and a removal action occurred on all three parcels of Defendants' Site. *See supra* Section IV.A(1)(b) & (2)(b).

#### 7. Is the application of CERCLA in this case unconstitutional?

The court finds that CERCLA is not unconstitutional facially and as applied to this case because CERCLA can be applied retroactively and its application in this case does not violate the Commerce Clause.

##### A. The retroactive application of CERCLA is constitutional.

Defendants argue that the application of CERCLA in this case is improper because CERCLA cannot be applied retroactively. In making their argument, Defendants rely on the decision in *United States v. Olin Corp.,* 927 F.Supp. 1502 (S.D.Ala.1996). In *Olin,* the court there held that the retroactive application of CERCLA is unconstitutional because neither the express language of the statute nor the legislative history of the statute demonstrated a congressional intent to have the statute apply retroactively and because § 107(a) of CERCLA, 42 U.S.C. § 9607(a) is not " 'the sort of provision that must be understood to operate retroactively because a contrary reading would render it ineffective.' " *Olin,* 927 F.Supp. at 1519 (quoting *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Relying on *Olin,* Defendants assert that CERCLA was enacted in 1980, that the disposal of drums, according to the Government's Site Assessment, occurred at least twenty years prior to the commencement of the removal action in 1992, and that as a result the application of CERCLA to this case is unconstitutional. Plaintiff responds by declaring that the holding in *Olin* "is contrary to the conclusion of every other court to have decided the question" of retroactivity. (Plaintiff's Response to Defendants' Motion For Summary Judgment, p. 27). Plaintiff further asserts that the two courts have addressed *Olin's* holding on retroactivity and have refused to follow it and that this court should do the same.

■ To resolve these arguments, the court looks to the two courts that have refused to follow *Olin, Cooper Industries, Inc. v. Agway, Inc.,* 1996 WL 550128 (N.D.N.Y. Sept.23, 1996) and *Gould, Inc. v. A & M Battery & Tire Service,* 933 F.Supp. 431 (M.D.Pa.1996), and the three pre-*Olin* courts that analyze the issue of *retroactivity, United States v. Northeastern Pharmaceutical & Chemical Co., Inc.,* 810 F.2d 726 (8th Cir. 1986); *United States v. Shell Oil Co.,* 605 F.Supp. 1064 (D.Colo.1985); and *Ohio v. Georgeoff,* 562 F.Supp. 1300 (N.D.Ohio 1983). The court finds that none of these courts misapplied or ignored, as Defendants claim, the traditional presumption against retroactivity. Instead, all of these courts acknowledged the traditional presumption of activity (alluded to in *Olin* and *Landgraf* ) but conclude that it is clear that Congress intended CERCLA to have retroactive effect. Consequently, the court here does the same. Its grounds are as follows: (1) the language used in the key liability provision of CERCLA refers to actions and conditions in the past tense, thus indicating that Congress in-

tended for CERCLA to be applied retroactively; (2) the statutory scheme of CERCLA is overwhelmingly retroactive; and (3) the legislative history indicates that CERCLA was intended to be applied retroactively.

(1)

Several provisions of CERCLA refer to actions and events in the past tense, thereby supporting the retroactive application of CERCLA. For example, § 107(a)(2) refers to "any person who *at the time of disposal* of any hazardous substances *owned or operated* any facility ....," and § 107(a)(3) imposes liability on "any person who ... *arranged* with a transporter for transport for disposal...." Such language is clear on its face. Although not dispositive, it supports Plaintiff's contention that Congress intended to apply CERCLA retroactively.

(2)

The statutory scheme of CERCLA also indicates that the statute is backward-looking. As the court in *Northeastern Pharmaceutical* argued, "CERCLA authorizes the EPA to force responsible parties to clean up inactive or abandoned hazardous sites, CERCLA § 106, 42 U.S.C. § 9606, and authorizes federal, state and local governments and private parties to clean up such sites and then seek recovery of their response costs from responsible parties, CERCLA §§ 104, 107, 42 U.S.C. §§ 9604, 9607. In order to be effective, CERCLA must reach past conduct." *Northeastern Pharmaceutical*, 810 F.2d at 733. While, as the *Olin* court asserted, such conclusion does not establish the statute's retroactivity, it does evince the intent of Congress to apply it retroactively.

(3)

Lastly, the legislative history of CERCLA indicates that it was intended to be applied retroactively. House Report No. 1016 states that the Solid Waste Disposal Act was amended by CERCLA, in part, "to establish prohibitions and requirements concerning inactive hazardous waste sites ... to provide for liability of persons responsible for releases of hazardous waste at such sites ...." H.R.REP. NO. 1016, *reprinted in* 1980 U.S.C.C.A.N. 6119. As the court in *Cooper Industries*, 1996 WL 550128, at *9 stated, "[t]he very use of the term 'inactive' can only suggest retroactive application of CERCLA liability." *Id.* Additionally, the Report notes the problem of "abandoned sites" and the fact that "of the 53 largest domestic chemical manufacturers ... 94% of their wastes have been disposed of on the plant site." *Id.* at 6123. Such statement is undoubtedly a reference to disposal that has occurred prior to the enactment of CERCLA. Lastly, the Report makes reference to "new sites." Again as the *Cooper Industries* court argued, "[t]he fact that inactive sites are discussed separately from new sites and the fact that inactive sites are discussed first suggests ... that ... CERCLA was intended to impose liability on those parties responsible for inactive sites. To effectuate this result, CERCLA must be applied retroactively." *Cooper Industries*, 1996 WL 550128, at *9. Thus, it cannot be said that the retroactive application of CERCLA in this case is unconstitutional.

*B. CERCLA is a valid exercise of Congress' power under the Commerce Clause.*

Defendants argue that Plaintiff has violated the Commerce Clause as interpreted by the Court in *Olin*. The Olin court interpreted the Commerce Clause analysis in *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), claiming that *Lopez* held the following: (1) the statute itself must regulate economic activity, which activity, must "substantially affect" interstate commerce; and (2) the statute must include a "jurisdictional element which would ensure, through a case by case inquiry, that the statute in question affects interstate commerce." *Olin*, 927 F.Supp. at 1532 (citations omitted). Applying these requirements to this case, Defendants conclude that Plaintiff's use of CERCLA violates the Commerce Clause. First, they claim that, on its face, CERCLA is unconstitutional because the object of the CERCLA regulation is not "economic activity." Second, they claim that the application of CERCLA is unconstitutional as applied here because there is no evidence that the contamination in this case traveled across state lines and because this case involved the disposal of drums on property

where economic activity was virtually non-existent.

■■■■■ The court believes that Defendants' arguments lack merit. First, on its face, CERCLA is a valid exercise under the Commerce Clause. The Supreme Court has identified three categories of regulation permissible under Congress' commerce powers: (1) regulation of the channels of interstate commerce; (2) regulation of the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) regulation of activities that substantially affect interstate commerce. *See Lopez,* 115 S.Ct. at 1629. CERCLA falls under the last two of these categories. Second, CERCLA is constitutional as applied here, because *Lopez* does not require the statute to include a "jurisdictional element which would ensure, through a case by case inquiry, that the statute in question affects interstate commerce." *Olin,* 927 F.Supp. at 1532 (citations omitted).

### (1)
### (a)

■■■■ The court finds that CERCLA does not fall under the first category in *Lopez,* which is limited to the regulation of the misuse of channels of interstate commerce. Plaintiff argues that CERCLA was enacted to "address hazardous substances generated primarily by manufacturers, like chemical companies and other industries, the products of which move in interstate commerce." (Plaintiff's Response to Defendants' Motion For Summary Judgment, p.36). CERCLA's primary function, however, is to facilitate the "clean-up of leaking inactive or abandoned sites and emergency response to spills." *United States v. Akzo Coatings of Amer., Inc.,* 949 F.2d 1409, 1417 (6th Cir.1991). Thus, CERCLA primarily applies to the threat of hazardous waste *after* it has been transported in interstate or intrastate commerce and consequently cannot be said to regulate the misuse of channels of interstate commerce.

### (b)

The court, however, finds that CERCLA falls under the second category in *Lopez*

which involves the regulation and protection of instrumentalities or interstate commerce, or person or things in interstate commerce. As stated by the court in *United States v. NL Industries, Inc.,* 936 F.Supp. 545, 557–58 (S.D.Ill.1996), "[o]ne of CERCLA's highest priorities is the protection of surface water and groundwater resources. The Supreme Court has explicitly recognized that groundwater is an article of commerce, and there is no doubt that surface waters ... are an integral part of interstate commerce." *Id.* (citations omitted). Additionally, the court in *NL Industries* noted that groundwater and surface water do not recognize state boundaries. *Id.* at 557 (S.D.Ill.1996). Therefore, it is within Congress' commerce power to regulate activities that pollute these resources, even where the threat only comes from intrastate activities. *See Hodel v. Virginia Surface Mining and Reclamation, Assoc.,* 452 U.S. 264, 281, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981).

### (c)

Lastly, the court finds that CERCLA falls under the third category in *Lopez,* which involves the regulation of activities that have a substantial effect on interstate commerce. In so doing, the court notes that Defendants' focus on the intrastate nature of this case is misplaced.

> [T]he denomination of an activity as a "local" or "intrastate" activity does not resolve the question whether Congress may regulate it under the Commerce Clause. As previously noted, the commerce power extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce .... the Commerce Clause [is] broad enough to permit congressional regulation of activities causing air or water pollution, or other environmental hazards that may have effects in more than one State.

*Hodel,* 452 U.S. 264, 281–282, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). Under this analysis,

CERCLA regulates economic activity that has a substantial effect on interstate commerce. As the court in *NL Industries* noted,

> the improper disposal of hazardous waste is economic activity. Hazardous waste is a by-product of numerous industries, from chemical manufacturing to dry cleaning. In addition to discouraging the improper disposal of hazardous: waste through its liability provisions, CERCLA regulates the clean-up of hazardous waste sites by establishing clean-up schedules and clean-up standards. The activities regulated by CERCLA have a much more direct impact on the economy than the somewhat speculative effect Roscoe Filburn's harvest[3] of twelve too many acres had on grain markets in Wickard.... In sum, CERCLA regulates economic activities which have a substantial affect on interstate commerce.

*NL Industries,* 936 F.Supp. at 563.

### (2)

 Second, with respect to Defendants' assertion that the application of CERCLA is unconstitutional as applied in this case, the court finds that *Lopez* does not require that CERCLA contain a "jurisdictional element which would ensure, through case-by-case inquiry, that the statute in question affects interstate commerce." *Olin,* 927 F.Supp. at 1532. In other words, *Lopez* does not require that there be proof that contamination traveled across state lines in this case. In fact, the Sixth Circuit openly criticized and rejected this interpretation of *Lopez* and the Commerce Clause by the *Olin* court when it upheld the constitutionality of another statute for which Congress had made broad and detailed findings regarding the substantial effect that its activity had on interstate commerce. *See United States v. Wall,* 92 F.3d 1444, 1449–50 & n. 11 (6th Cir.1996). Unlike the statute in *Wall,* CERCLA's legislative history does not contain any specific findings regarding the effect

that the improper disposal of hazardous waste has on interstate commerce. It does, however, contain broad findings that provide a rational basis on which to conclude that the improper disposal of hazardous waste substantially affects interstate commerce. *See Cooper Industries,* 1996 WL at 550128, at *11; *NL Industries,* 936 F.Supp. at 561. *See also Lopez,* 115 S.Ct. at 1631 (stating that "Congress is not normally required to make formal findings as to the substantial burdens that an activity has on interstate commerce"). For example, in the report of the Committee on Interstate and Foreign Commerce, Congress identified the tremendous cost that hazardous waste dumping incurred on public entities. *See NL Industries,* 936 F.Supp. at 561 ("[T]he report estimates that it would costs between $13.1 and $22.1 billion to clean up all hazardous waste that poses a danger to public health and the environment. The report also summarizes the estimates of the cost to individual States of cleaning up specific sites.") (citations omitted). Additionally, in the report of the Senate Committee on Environment and Public Works, Congress stated that "releases of hazardous waste have 'resulted in the contamination of drinking water and long-term contamination of wells, in massive fish kills, air pollution, loss of livestock and food products to contaminated drinking water and feed, and the destruction of wildlife.'" *Id.* at 562; *Cooper Industries,* 1996 WL 550128, at *11. Like the courts in *Cooper Industries* and *NL Industries,* the court believes that these findings are a sufficient basis upon which to hold that CERCLA need not have a "jurisdictional element which would ensure, through case-by-case inquiry" that it affects interstate commerce. As stated in *Wall,* "Congress ... may regulate commercial activities that, although intrastate in nature, comprise a class of activities-that substantially affect interstate commerce." *Wall,* 92 F.3d at 1450, n. 14. Such is the case here, and thus CERCLA's regulation of hazardous waste disposal as applied in this case

---

3. The court in *NL Industries* was referring to the plaintiff in *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). In that case, the plaintiff had harvested twelve more acres of wheat than he was permitted under the Agricultural Adjustment Act of 1938. There the Court upheld the Act, stating that its primary purpose was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market. Wickard's home grown wheat "competed" with wheat in commerce and thus, when coupled with all other home-grown wheat, had a substantial effect on interstate commerce.

must be constitutional. "[T]he Commerce Clause [is] broad enough to permit congressional regulation of activities causing air or water pollution, or other environmental hazards that may have effects in more than one State." *Cooper Industries,* 1996 WL 550128, at *11 (citing *Hodel,* 452 U.S. at 282, 101 S.Ct. 2352). *See also Hodel,* 452 U.S. at 281, 101 S.Ct. 2352 ("[T]he denomination of an activity as a "local" or "intrastate" activity does not resolve the question whether Congress may regulate it under the Commerce Clause. As previously noted, the commerce power extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce...."). As shown in previous sections, the clean-up of disposed hazardous waste on sites is exactly this kind of activity. Consequently, the court does not find the analysis of the Commerce Clause in *Olin* to be correct.

For the foregoing reasons, the court finds that the regulation of improper disposal of hazardous waste under CERCLA is a valid exercise under the Commerce Clause on its face and as applied to this case.

## CONCLUSION

For all of these reasons, Plaintiff's Motion For Summary Judgment (Docket No. 37) is granted, and Defendants' Motion For Summary Judgment (Docket No. 49) is denied.

IT IS SO ORDERED.

## *JUDGMENT ENTRY*

The court, having granted Plaintiff's Motion For Summary Judgment (Docket No. 37) and denied Defendants' Motion For Summary Judgment (Docket No. 49) in a separate order, now enters judgment for the Plaintiff and against the Defendants.

IT IS SO ORDERED.